## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **DENARD ROBINSON; BRAYLON EDWARDS; MICHAEL MARTIN; SHAWN CRABLE, Individually and on behalf of themselves and former University of Michigan football players similarly situated,** | **Case No.:** |
| **Plaintiffs,** | |
| **v.** | |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION aka "NCAA"; BIG TEN NETWORK "aka" BTN,** | |
| **Defendants.** | |

CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC
BY:   JAMES R. ACHO (P62175)
Attorneys for Plaintiffs
17436 College Parkway, 3rd Floor
Livonia, MI 48152
734-261-2400 / 734-261-4510 fax
jacho@cmda-law.com

## COMPLAINT
## CLASS ACTION
### (Jury Trial Demanded)

NOW COME Plaintiffs, **DENARD ROBINSON** (**"Robinson"**);

**BRAYLON EDWARDS** (**"Edwards"**); **MICHAEL MARTIN** (**"Martin"**);

**SHAWN CRABLE** (**"Crable"**) (sometimes collectively referred to as

**"Plaintiffs"**), by and through their attorneys, James R. Acho and CUMMINGS,

MᶜCLOREY, DAVIS & ACHO, PLC  and for their complaint against the National Collegiate Athletic Association aka NCAA ("NCAA") and Big Ten Network ("BTN") state that:

## INTRODUCTION

*This is a Class Action on behalf of all former University of Michigan Football players who played prior to 2016. It seeks to right a wrong perpetuated on college athletes for decades.*

The University of Michigan Football program is arguably the most iconic in college football history. It is undoubtedly the most recognized brand nationally. Storied teams, legendary players, and some of the most historic moments in the sport's history were created by the Michigan Program and its players – specifically by the players, many of whom are among the most notable names in the sport's history. While today, it is accepted and understood that current college football players are allowed to be compensated monetarily, especially for using their name, image, and likeness (sometimes referred to as "NIL"), players were wrongfully and unlawfully prevented from doing so for decades. The NCAA knew it was wrong but still continued to profit. When Brian Bosworth famously wore a shirt in the 1980s on the sideline of the National Championship game, with the shirt saying "NCAA" stands for "National Communists Against Athletes," it drew guffaws from older fans, but players nodded in agreement; they knew thirty-five (35) years ago that

2

preventing them from capitalizing in the most valuable thing they have – their name, image, and likeness was wrong.  Not just wrong, but unlawful. This action seeks to compensate former Michigan players and rectify that unlawful wrong.

## PARTIES, VENUE AND JURISDICTION

1.      Denard Robinson is a former NCAA student-athlete who played football at the University of Michigan from 2009 to 2012. Originally from Deerfield Beach, Florida, Robinson now resides in Ann Arbor, Michigan. Robinson became a household name in college football, earning the nickname "Shoelace" for his habit of playing with untied cleats. Robinson's legacy as a Michigan quarterback is firmly established in the record books. He still holds several key records, including the most rushing yards by a quarterback in NCAA history, the most total yards in a single season in Michigan's storied history, and the most rushing touchdowns by a quarterback at Michigan. Robinson also holds the Michigan record for the most 200-yard rushing games by a quarterback and the longest run from scrimmage by a quarterback. His dual-threat capability and electrifying performances have left an indelible mark on the program, ensuring his place among the all-time greats. These iconic moments have been repeatedly shown and replayed on BTN and related networks, helping continue the fascination and passion of the sport. They have significantly contributed to the revenue generated by the NCAA and its partners. Despite his pivotal role in creating these commercially valuable moments, Robinson

{02126348-1 }

has never received compensation and was NOT allowed to capitalize monetarily for the use of his name, image, and likeness and lost out on several million dollars.

2.     Braylon Edwards is a former NCAA student-athlete who played football at the University of Michigan from 2001 to 2004. Originally from Detroit, Michigan, Edwards now resides in Beverly Hills, Michigan. Edwards, an electrifying wide receiver captivated audiences with his remarkable athleticism, speed, and game-changing plays. Known for his exceptional catching ability and clutch performances, Edwards delivered some of the most unforgettable moments in Michigan football history. His iconic three-touchdown game against Michigan State in 2004 remains a staple in highlight reels and has been replayed countless times across television broadcasts, online platforms, and promotional materials. These moments have driven substantial commercial revenue for the NCAA and its broadcasting partners. Despite his significant contributions and the ongoing use of his name, image, and likeness to generate profits, Edwards has never been compensated for the commercialization of his personal attributes and was NOT allowed to capitalize monetarily for the use of his name, image, and likeness and lost out on several million dollars.

3.     Michael Martin is a former NCAA student-athlete who played football at the University of Michigan from 2008 to 2011. Born and raised in Redford Township, Michigan, Martin currently resides in Canton, Michigan. Martin, a

{02126348-1 }

formidable defensive lineman, was celebrated for his powerful presence on the field, relentless pursuit of quarterbacks, and ability to disrupt opposing offenses. His leadership qualities made him a cornerstone of the Wolverines' defense. Martin earned numerous accolades, including All-Big Ten honors, and played a pivotal role in memorable victories, such as the 2011 win over Notre Dame. His commanding performances and game-changing plays, including powerful tackles, have been showcased in numerous highlight reels and promotional videos, generating significant revenue for the NCAA and its partners. Despite his substantial contributions and the repeated broadcast of his highlights, Martin has never been compensated for the commercial use of his name, image, and likeness, drawing viewers and advertisers alike without receiving any share of the profits.

4.     Shawn Crable is a former NCAA student-athlete who played football at the University of Michigan from 2003 to 2007. Originally from Massillon, Ohio, Crable currently resides in Canton, Ohio. Crable, a dominant linebacker, was renowned for his exceptional defensive skills, including his relentless pursuit of quarterbacks and game-changing tackles. Crable's powerful presence and leadership on the field were pivotal in key victories, such as his memorable sack against Penn State in 2005 that helped secure a crucial win. His standout performances have been immortalized in numerous highlight reels, which continue to be replayed across television broadcasts, online platforms, and promotional materials, generating

{02126348-1 }

significant revenue for the NCAA and its partners. Despite his critical contributions and the ongoing commercial use of his name, image, and likeness, Crable has never received compensation for the exploitation of his personal attributes, which have been utilized to attract viewers and generate profits for the NCAA and its affiliates.

5.     Numerous other former University of Michigan football players have similarly created unforgettable moments that the NCAA and its partners have repeatedly monetized. The team has a rich history of delivering clutch performances that have become integral to Wolverine lore. From the 1969 win over Ohio State that shocked a nation of football fans, to the unforgettable 1991 game featuring the iconic "Heisman" pose, the 1997 national championship-clinching win over Ohio State, and the Tom Brady-led thrilling victory in the 2000 Orange Bowl against Alabama, the team's legacy is built on moments of exceptional talent and competitive spirit. The named Plaintiffs, and other former University of Michigan football players have seen their names, images, and likenesses used by the NCAA and its partners without consent or compensation, resulting in significant financial and personal harm.

6.     Defendant National Collegiate Athletic Association (NCAA) is an unincorporated association headquartered in Indianapolis, Indiana. The NCAA oversees more than 1,100 member schools, including the University of Michigan, and regulates intercollegiate athletics. The NCAA generates substantial revenue through the commercialization of student-athletes' performances and identities, yet

{02126348-1 }

it does so without providing fair compensation to the athletes themselves.

7.      Defendant Big Ten Network (BTN) is a multi-platform sports network dedicated to broadcasting and promoting collegiate athletics, specifically those of the Big Ten Conference, which includes the University of Michigan. BTN is headquartered in Chicago, Illinois, and operates as a joint venture between the Big Ten Conference and Fox Sports. Since its inception, BTN has profited substantially from the broadcast and commercial distribution of football and other collegiate sporting events. This includes live games, replays, highlight reels, documentaries, and promotional content featuring student-athletes from the University of Michigan and other Big Ten institutions. BTN actively engages in the commercialization of student-athletes' performances and identities by licensing their games for national and international broadcasts, selling advertisements, and promoting subscriptions to its platform. Despite these lucrative activities, BTN has failed to provide any form of compensation to the student-athletes whose names, images, and likenesses it regularly exploits for profit, contributing to the broader systemic exploitation within collegiate athletics.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The claims involve significant

7

questions of federal law, including the interpretation and application of antitrust statutes designed to protect competition and prevent unfair trade practices.

9.      The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) in that this is a Class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed Class are citizens of a state different from Defendants. The diversity of citizenship between the Plaintiffs and Defendants further establishes federal jurisdiction.

10.      The Court has personal jurisdiction over Defendants because they have transacted business within the state of Michigan, including organizing intercollegiate athletics contests, marketing, promoting, licensing or selling merchandise, and engaging in substantial contacts within the state. The Defendants' activities in Michigan, including their direct commercial exploitation of University of Michigan student-athletes, provide a sufficient nexus to establish personal jurisdiction.

11.      Venue is appropriate in this District under 28 U.S.C. § 1391(b) & (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within this District, including the exploitation of University of Michigan student-athletes and the broadcasting of their games. Additionally, several Plaintiffs reside in this District, and the Defendants conduct substantial business here, further

{02126348-1 }

justifying the selection of this venue.

12.     The NCAA's practices of exploiting student-athletes' names, images, and likenesses without compensation, as well as its agreements with its member institutions and broadcasting partners, have had a direct and substantial impact on commerce within this District. The commercial activities related to these practices, including broadcasting and merchandising, are central to the claims presented in this Complaint and underscore the appropriateness of this jurisdiction and venue.

## FACTUAL ALLEGATIONS

13.     Michigan's 1997 season, which featured the iconic punt return touchdown by its Heisman-winning player, against Ohio State, remains a pinnacle of college football history. This game, part of the intense and storied Michigan-Ohio State rivalry, has been replayed countless times across various media platforms, generating substantial revenue for the NCAA and its broadcasting partners. The annual clash between these two football powerhouses, often televised nationally, has consistently drawn massive audiences. The Michigan-Ohio State game, known as "The Game," is one of the most historic and fiercely contested rivalries in college football, often with significant implications for conference titles and national championships. The 1997 season not only secured this former team's place in history but also significantly boosted viewership and advertising revenue, contributing to the NCAA's financial success.

9

14.    These named former student-athletes like Denard Robinson, Michael Martin, Braylon Edwards, and Shawn Crable, as well as countless other ex-Michigan football players, have made significant contributions, with their game-winning plays and electrifying performances frequently featured in highlight reels and promotional content, as detailed in this Complaint. These moments continue to attract viewers and boost merchandise sales as the NCAA capitalizes on the compelling stories of these Michigan legends. Additionally, the team's successes led by other Michigan greats like Tom Harmon, Anthony Carter, Tom Brady, Charles Woodson, Desmond Howard, and many more further highlight the program's storied tradition, showcasing national championships, Heisman trophies, and legendary victories that reinforce the powerful legacy left by these athletes and their teams, who have all left an indelible mark on the program.

15.    However, it is not only the star athletes who have been wronged. Countless other former University of Michigan football players, who may not have achieved the same level of fame, have also contributed significantly to the rich history and success of University of Michigan football. Their memorable plays and pivotal moments have been utilized in broadcasts, promotions, and merchandise, driving revenue without any compensation. These student-athletes, often overshadowed by the more prominent names, have equally been denied their fair share of the profits generated from their hard work and talent. The exploitation

{02126348-1 }

extends beyond the big names to include every student-athlete who has ever taken the field and created value for the NCAA. Irrespective of national fame, most of these players would have capitalized and earned money on their name and image in the small window that was their college football career. They were wrongfully and unlawfully denied from doing so.

16.     The history of Michigan football is replete with monumental games and iconic plays that have not only defined the sport but also driven the NCAA's commercial success. From Bo Schembechler's "Ten Year War" against Ohio State's Woody Hayes to the modern era's unforgettable matchups, these televised rivalries have been a cornerstone of college football's popularity. The NCAA has extensively monetized these moments, replaying them across various platforms, selling related merchandise, and promoting them in advertisements, all while the athletes themselves have not received compensation for the use of their names, images, and likenesses.

17.     This practice of exploiting not just individual players, but the historic and emotionally charged rivalries, which form the bedrock of college football's appeal, underscores the systematic inequity inherent in the NCAA's policies. The organization has profited immensely from the talents and achievements of the University of Michigan's football legends, leveraging their contributions to attract millions of viewers, secure lucrative broadcasting deals, and sell a wide array of

merchandise. Despite their critical roles in creating these commercially valuable moments, the athletes have been denied their rightful share of the profits. This fundamental injustice, affecting both well-known and lesser-known athletes, is a central issue that this Complaint seeks to address and rectify.

18.     The Defendants, including the NCAA, Big Ten Network, and its agents and subsidiaries, have systematically exploited these iconic moments that these Class Members have created without compensating the student-athletes who created them. These organizations have monetized the athletic feats of Martin, Robinson, Edwards, Crable, and countless other University of Michigan football players by broadcasting, advertising, and selling merchandise featuring their performances, all without their consent or any form of remuneration. Defendants have used the images and videos of Plaintiffs and similarly situated Class Members to advertise for their commercial purposes without the athletes' consent and while paying them nothing.

19.     The NCAA football season, heavily promoted through the use of these highlights and key moments, generates billions of dollars annually. Yet the student-athletes whose blood, sweat, and tears drive this revenue see none of it. For example, NCAA.com and affiliated websites host numerous videos showcasing these former players. Robinson's electrifying "Shoelace" moments, Martin's defensive dominance and his iconic celebration after a triple-overtime victory—broadcast repeatedly across the country by BTN and other networks—Edwards' spectacular catches, and

{02126348-1 }

Crable's game-changing defensive plays, including the unforgettable hit on Ohio State's Troy Smith that has been replayed thousands of times. These moments and countless highlights from other former University of Michigan football players continue to draw millions of views, generating substantial advertising revenue for media platforms. Yet, despite their pivotal role in creating this revenue, these athletes have received none of the financial benefits from their contributions.

20.    The NCAA generates billions of dollars annually, with a substantial portion derived from media contracts, such as its partnership with BTN. BTN alone generates hundreds of millions of dollars from broadcasting rights, advertising, and subscription fees, particularly from high-profile games involving Michigan football. BTN has broadcasted current and Class Michigan Football games since 2006. The Michigan-Ohio State rivalry, one of the highest-grossing annual events, attracts millions of viewers and secures lucrative advertising deals. Despite this overwhelming financial success, none of the student-athletes whose performances are central to this revenue receive any compensation. This stark economic imbalance underscores the NCAA's and BTN's systematic exploitation of student-athletes, who are denied the financial benefits that their contributions create.

21.    NCAA rules require student-athletes to sign forms that effectively transfer their publicity rights to the NCAA. These forms, presented as a non-negotiable condition of participation, strip student-athletes of their ability to control

13

the use of their names, images, and likenesses. This practice ensures that the NCAA and its partners can exploit these rights indefinitely, without ever compensating the student-athletes whose talents and hard work generate substantial revenue. The United States Supreme Court, in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 90 (2021), noted that the NCAA "enjoy[s] monopsony [(i.e., buyer-side monopoly)] power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." The NCAA admitted as much in its briefing for *Alston*.

22.     The named Plaintiffs, represent a broader Class of former NCAA student-athletes who have been similarly exploited. These athletes, who committed themselves to their sports and their education, have been denied the opportunity to benefit financially from their own identities. The NCAA has conspired with conferences, colleges, licensing companies, and apparel companies to fix the price of student-athlete labor near zero and make student-athletes unwitting and uncompensated lifetime pitchmen for the NCAA. This Complaint seeks to address this systemic injustice by holding the NCAA, its partners, and affiliates accountable for their actions.

23.     The Plaintiffs' claims are grounded in well-established legal principles, including the right to publicity, which protects individuals from unauthorized commercial use of their identities. The NCAA and BTN's unauthorized use of the

Plaintiffs' names, images, and likenesses violates this right and constitutes unjust enrichment at the expense of the student-athletes. This conduct constitutes unreasonable restraint of trade, illegal monopolization, tortious misappropriation of publicity rights, and unjust enrichment.

24.    This Complaint aims to rectify Defendants' systematic exploitation of Class Members by obtaining compensation for the commercial use of their personal attributes and an injunction to prevent future misappropriation. The relief sought includes declaratory and injunctive relief, compensatory and punitive damages, and an award of attorneys' fees and costs.

25.    By bringing this action, the Plaintiffs seek to protect future generations of student-athletes from similar exploitation, ensuring that they can benefit from their hard work and talent both during and after their collegiate careers and for as long as Defendants profit from them. The NCAA's illegal profit scheme is carried out through various partners and co-conspirators, some of whom are known and some unknown.

26.    The NCAA's Constitution claims to protect student-athletes from exploitation by professional and commercial enterprises. However, the organization has exploited former student-athletes for decades by requiring them to cede their rights to their names, images, and likenesses and then appropriating those rights without compensation long after the student-athletes have graduated.

{02126348-1 }

27.    Article 2.9 of the NCAA Constitution states that "student-athletes should be protected from exploitation by professional and commercial enterprises." Despite this, the NCAA has and continues to exploit former student-athletes' publicity rights for commercial gain. The NCAA's actions demonstrate a clear, self-serving exploitation, highlighting a deceptive and exploitive conflict between its professed mission and its actual practices.

28.    The NCAA's exploitation of former student-athletes' names, images, and likenesses has generated substantial revenue through various means, including television broadcasts, advertisements, and online content. For example, the NCAA and its Co-Defendants, including BTN, have repeatedly used footage of iconic moments from University of Michigan football games for commercial purposes. These uses have included highlight reels, promotional videos, and digital content, all of which generate significant advertising revenue.

29.    The NCAA's requirement that student-athletes waive their publicity rights is not a mere formality; it is a coercive practice that forces young and financially unsophisticated student-athletes, often with dreams of professional sports careers, to give up their rights under duress. This practice is fundamentally unfair and contrary to the principles of equity and justice. The United States Court of Appeals *In re NCAA Student-Athlete Name & Likeness Licensing Litig.,* 724 F.3d 1268 (9th Cir. 2013) recognized the inherent coercion in such practices, ruling that

16

the NCAA's use of student-athlete likenesses in video games without consent constituted a violation of their right of publicity.

30.     The NCAA's exploitation extends beyond television broadcasts. The organization and its Co-Defendant profit from merchandise sales, video game licensing, and other commercial uses of the student-athletes' identities. The athletes, however, receive no share of this substantial revenue. This exploitation is evident in cases such as *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), where the court found that the NCAA's compensation rules violated antitrust law by preventing student-athletes from receiving a share of the revenue generated from their own likenesses.

31.     The NCAA's practices have been challenged legally and publicly. Numerous lawsuits and media reports have highlighted the exploitative nature of the NCAA's control over student-athletes' publicity rights, yet the organization has persisted in its practices. The persistence of these practices despite legal challenges underscores the entrenched nature of the NCAA's exploitative model. "The NCAA is not above the law." (*Alston*, 594 U.S. at 112 (Kavanaugh, J., concurring)).

32.     The Plaintiffs, representing a Class of similarly situated former University of Michigan football players, seek to hold the NCAA accountable for its actions and obtain injunctive relief and just compensation for the unauthorized use of their names, images, and likenesses. The Plaintiffs' claims are supported by legal

precedent and the fundamental principles of equity and justice.

33.     This action seeks to correct the systemic injustices perpetuated by the NCAA and to establish legal protections for future student-athletes. The Plaintiffs seek compensatory and punitive damages, injunctive relief, and any other relief this Court deems just and proper. The relief sought aims to restore the Plaintiffs' rights and to prevent further exploitation of student-athletes by the NCAA.

34.     The relief sought by the Plaintiffs includes a declaration that any assignment of publicity rights induced by the NCAA, its partners, and affiliates, including BTN, is unlawful and unenforceable. Additionally, the Plaintiffs seek a permanent injunction enjoining the NCAA and any person or entity acting through it from relying on any unenforceable assignment of publicity rights.

35.     The Plaintiffs further seek a declaration of entitlement to a present and future share of any revenue generated from the use of their publicity rights, including but not limited to the use of their name, image, and likeness. The Plaintiffs also seek compensation for any revenue generated from the use of their past publicity rights, including but not limited to the use of their name, image, and likeness during their period of eligibility and after through licensing, marketing, promotion, online, or other income streams known, and that will become known through discovery, that Class Members would have received absent the NCAA's unlawful conduct.

36.     The Plaintiffs' claims are based on the NCAA's long-standing practices

{02126348-1 }

and agreements that restrict student-athletes' ability to monetize their identities. These practices and agreements constitute unreasonable restraints of trade and have resulted in substantial financial harm to the Plaintiffs and the Class they represent.

37.    By addressing these systemic issues, this lawsuit seeks not only to provide relief to the Plaintiffs and the Class by ensuring fairness and equity for those who contribute their talents and efforts to collegiate sports and deserve to share in the revenues generated by their performances but also to reform the NCAA's practices to prevent future exploitation of student-athletes.

38.    The NCAA and its named and unnamed co-conspirators have systematically and intentionally misappropriated the publicity rights of Denard Robinson, Michael Martin, Braylon Edwards, Shawn Crable and other Class Members by using their names, images, and likenesses for commercial purposes without their consent or compensation. This misappropriation has resulted in significant revenue for the NCAA and its partners while depriving the student-athletes of their rightful earnings. Such actions constitute clear antitrust injury as they deprive the marketplace of independent centers of decision-making and potential competition.

39.    The NCAA was founded in 1906 with the primary purpose of protecting student-athletes' health, safety and welfare in response to the brutality of college football games. Over time, The NCAA's focus shifted to protecting "amateurism" in

{02126348-1 }

college athletics by imposing rules and limits on recruitment, financial aid, and academic performance standards. This shift has allowed the NCAA to exert substantial control over the terms and conditions of student-athlete participation in college sports, ultimately enabling the exploitation of student-athletes' publicity rights for commercial gain.

40.    The NCAA oversees more than 1,100 member schools and a half million student-athletes, sponsoring over 90 national championships in 24 sports. The NCAA generates significant revenue from television and marketing rights for these championships, including the highly lucrative NCAA football season. This revenue is derived in large part from the commercial use of student-athletes' names, images, and likenesses, despite the NCAA's claims of protecting these athletes from commercial exploitation.

41.    The NCAA's constitution claims to protect student-athletes from exploitation by professional and commercial enterprises. However, the organization has exploited former student-athletes for decades by requiring them to cede their rights to their names, images, and likenesses, and then appropriating those rights without compensation long after the student-athletes have graduated. This exploitation is contrary to the principles of equity and justice and undermines the stated mission of the NCAA, as evidenced by its continued generation of profit from such practices.

{02126348-1 }

42.     As previously mentioned, Article 2.9 of the NCAA constitution states that "student-athletes should be protected from exploitation by professional and commercial enterprises." Despite this, the NCAA has continued to exploit former student-athletes' publicity rights for commercial gain. The NCAA's actions demonstrate a clear contradiction between its stated mission and its actual practices, highlighting the need for judicial intervention to uphold these principles and protect the rights of student-athletes.

43.     The NCAA's exploitation of former student-athletes' names, images, and likenesses has generated substantial revenue through various means, including television broadcasts, advertisements, and online content. For example, the NCAA, BTN, their partners, and affiliates have repeatedly used footage of Plaintiffs' and other Class Members' iconic moments from University of Michigan football games for commercial purposes. These uses have included highlight reels, promotional videos, and digital content, all of which generate significant advertising revenue without compensating the student-athletes involved.

44.     Denard Robinson's record-setting performances and game-winning plays, Braylon Edwards' spectacular catches and memorable touchdowns, Michael Martin's standout defensive plays and leadership on the field, Shawn Crable's game-changing defensive maneuvers and other Class Member highlights have all been extensively used in promotional materials and commercial broadcasts by the NCAA,

{02126348-1 }

its partners and affiliates. These uses include, but are not limited to, highlight reels, promotional videos, and digital content available on the NCAA.com website. Each student-athlete contributed to some of the most iconic moments in University of Michigan football history, which have been repeatedly showcased to generate substantial advertising revenue. However, despite their significant contributions, these student-athletes have been denied any share of the profits, which the NCAA and its affiliates continue to reap.

45.   The NCAA's illegal conduct has deprived Robinson, Martin, Edwards, Crable, and numerous other former University of Michigan football players of substantial profits they would have otherwise earned from their publicity rights. This exploitation is aimed primarily at generating profit for the NCAA and its partners. The substantial revenue generated from these commercial uses has not been shared with the student-athletes, who are the rightful owners of these rights. This clear antitrust injury demonstrates the NCAA's collusion to deny these athletes the market benefits they rightfully deserve, perpetuating a systematic injustice against those who have significantly contributed to the NCAA's financial success.

46.   The NCAA controls virtually all collegiate sports, especially at the elite levels, and it controls access to scholarship funds for Division I student-athletes. NCAA Division I schools, such as the University of Michigan, provide the major pathway to professional sports for most student-athletes. This control over the

{02126348-1 }

pathway to professional sports gives the NCAA significant leverage over student-athletes, who must comply with its rules to pursue their athletic careers, thereby perpetuating the coercive practice of forcing student-athletes to sign away their publicity rights.

47.   The NCAA and its co-conspirators have leveraged their monopoly power in the market for student-athlete services to exploit student-athletes from the time before they enter college until long after they end their collegiate careers. This exploitation continues to this day, with Defendants continuing to use former student-athletes' names, images, and likenesses for commercial purposes without their consent and without compensating them. The continuing nature of this exploitation underscores the need for judicial intervention to protect student-athletes' rights and address the systemic injustices perpetrated by the NCAA.

48.   The NCAA's mandate that student-athletes relinquish their publicity rights is far from a mere procedural requirement. It is a coercive tactic that pressures young student-athletes, many of whom harbor aspirations of professional sports careers, to forfeit their rights under duress. This practice is intrinsically unfair and violates principles of equity and justice. The United States Court of Appeals *In re NCAA Student-Athlete Name & Likeness Licensing Litig.,* 724 F.3d 1268 (9th Cir. 2013) recognized the coercive nature of these practices, ruling that the NCAA's unauthorized use of student-athlete likenesses in video games constituted a violation

of their right of publicity.

49.    The NCAA's exploitation extends well beyond television broadcasts. The organization, along with its partners and affiliates, reaps significant profits from merchandise sales, video game licensing, and various other commercial uses of student-athletes' identities. Meanwhile, the student-athletes themselves receive no portion of this substantial revenue. This blatant exploitation is evident in cases such as *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), where the court determined that the NCAA's compensation rules breached antitrust laws by preventing student-athletes from obtaining a share of the revenue generated from their own likenesses.

50.    Despite facing other legal and public challenges, the NCAA has continued its exploitative practices. Numerous lawsuits and media reports have highlighted the exploitative nature of the NCAA's control over student-athletes' publicity rights. Yet, the organization has remained steadfast in its practices, underscoring the entrenched nature of its exploitative model. This persistence, despite mounting legal challenges, necessitates further legal action to safeguard the rights of student-athletes.

51.    The Plaintiffs, representing a Class of similarly situated former NCAA student-athletes, seek to hold the NCAA accountable for its actions and to secure just compensation for the unauthorized use of their names, images, and likenesses. The Plaintiffs' claims are underpinned by robust legal precedent and fundamental

{02126348-1 }

principles of equity and justice. This lawsuit aims to address the systemic injustices perpetuated by the NCAA and to establish legal protections for future student-athletes.

52.     The NCAA and its named and unnamed co-conspirators have illegally agreed to exploit student-athletes by using their monopoly power to force student-athletes to give up their legal right of publicity and control of their name, image, and likeness, asserting a perpetual license of student-athletes' NIL rights; and appropriating those rights for decades, long after the athletes have completed their collegiate careers. This collusion and exploitation are directly aimed at generating substantial profits for the NCAA and its partners at the expense of the athletes' rights and potential earnings.

53.     The NCAA's foundational purpose was to protect the health and safety of student-athletes, a mission that has been overshadowed by its current focus on protecting "amateurism" and controlling the commercialization of college athletics. This shift has enabled the NCAA to impose restrictive rules that prevent student-athletes from benefiting financially from their own names, images, and likenesses while allowing the organization to profit immensely from these very attributes.

54.     The NCAA's financial disclosures reveal a stark contradiction between its stated mission and its actions. In its Notes to Consolidated Financial Statements for August 31, 2023, the NCAA identifies itself as "the organization through which

colleges and universities of the nation speak and act on athletic matters at the national level." The organization claims its mission is to "[p]rovide a world-Class athletics and academic experience for student-athletes that fosters lifelong well-being." Despite this, the NCAA's primary revenue sources include television and marketing rights, highlighting its commercial interests and the exploitation of student-athletes' publicity rights.

55.     The NCAA's Constitution and Bylaws, including Section 12.5, which addresses athletes' participation in promotional activities, explicitly forbid the commercial use of student-athletes' names, images, or likenesses without their consent. However, the NCAA has systematically violated these rules by coercing student-athletes into signing forms that relinquish their rights and then exploiting these rights for commercial gain without any compensation to the athletes.

56.     The NCAA's practices have not only been exploitative but also coercive. Under NCAA Bylaw 14.1.3.1, student-athletes are required to sign a form titled "Student-Athlete Statement" each academic year before their athletic season begins. This form includes clauses that effectively force young athletes to give up their publicity rights under duress, with the threat of ineligibility for competition if they refuse to sign.

57.     The NCAA's coercive practices are further exacerbated by the disparity in bargaining power between the organization and the student-athletes. The

"Student-Athlete Statement" form is typically presented by authority figures such as coaches, athletic directors, or compliance officers, creating an environment where student-athletes feel compelled to sign without fully understanding the long-term implications of their agreement.

58.    Furthermore, the NCAA.com website features a store where visitors can purchase NCAA Championships gear, jerseys, t-shirts, and other "team-spirited" items promoting specific schools and NCAA tournaments. These sales generate significant revenue for the NCAA, a substantial portion of which is derived from the use of student-athletes' names, images, and likenesses without their consent or compensation. For instance, jerseys bearing the names and numbers of University of Michigan stars like Denard Robinson and Braylon Edwards are sold, yet the athletes receive no compensation. This practice exemplifies the NCAA's systematic exploitation of student-athletes, capitalizing on their popularity and success to drive merchandise sales while denying the athletes any financial benefit from the use of their personal attributes.

59.    The NCAA, its partners, and affiliates, including BTN, have extensively utilized footage of iconic moments from University of Michigan football games in their broadcasts. These broadcasts include highlights, promotional videos, and other content that generate substantial advertising revenue. Highlights of memorable plays, such as Denard Robinson's electrifying runs, Michael Martin's

{02126348-1 }

dominant defensive performances, Braylon Edwards' spectacular catches and game-winning touchdowns, and Shawn Crable's game-changing defensive maneuvers, are repeatedly aired. These broadcasts not only captivate audiences but also drive significant advertising revenue and viewership. Despite the immense commercial benefits derived from showcasing these athletes' remarkable achievements, none of the generated revenue is shared with the athletes themselves. This practice underscores the persistent and systematic exploitation of their names, images, and likenesses by the NCAA and its affiliates, depriving the athletes of the financial rewards they rightfully deserve for their contributions to the sport.

60.     The NCAA's requirement compelling student-athletes to waive their publicity rights as a condition of participation has long been a standard practice. This requirement forces young athletes, often with dreams of professional sports careers, to give up their rights under duress, a practice fundamentally unfair and contrary to the principles of equity and justice. This practice was enforced rigorously even during the careers of notable University of Michigan athletes, ensuring the NCAA maintained exclusive control over their valuable publicity rights.

61.     The NCAA's exploitation extends far beyond live broadcasts, profiting immensely from the sale of archival footage, highlight reels, and other media featuring former student-athletes. Highlights of Denard Robinson's game-winning performances, Braylon Edwards' spectacular catches, Michael Martin's standout

defensive plays, Shawn Crable's game-changing defensive maneuvers, and countless plays from other Class Members continue to generate revenue through platforms like YouTube and NCAA.com. These platforms showcase iconic Michigan victories, such as the thrilling 2011 win over Notre Dame and Braylon Edwards' unforgettable three-touchdown game against Michigan State in 2004, which are essential for driving viewer engagement and advertising revenue. Additionally, the contributions of other notable University of Michigan student-athletes, including a last-second touchdown against Indiana in 1979, a Heisman-winning punt return against Ohio State in 1991, and a record-setting 313-yard rushing performance against Ohio State in 1995, are extensively monetized by the NCAA. These historic moments, replayed countless times across various media platforms, captivate audiences and generate significant revenue through advertisements, licensing deals, and merchandise sales.

62.    Additionally, countless unnamed University of Michigan football players have significantly contributed to these memorable plays and games. Their efforts in blocking, tackling, and executing critical plays have been integral to the success of their more celebrated teammates and the team's overall performance. These student-athletes, though not always in the spotlight, have played crucial roles in creating the iconic moments that the NCAA continues to exploit for commercial gain. Despite their central role in creating these iconic moments, these athletes have

29

received no compensation for the ongoing commercial use of their names, images, and likenesses. This ongoing exploitation underscores the NCAA's systematic practice of profiting from the hard work and talent of student-athletes while denying them their rightful share of the revenues generated. The rich history and storied rivalries of University of Michigan football, brought to life through the remarkable performances of its players, continue to be leveraged for financial gain without providing any financial benefits to the athletes themselves, highlighting a clear and ongoing injustice.

63.     The NCAA maintains multiple YouTube channels and a comprehensive online platform where historic games and highlights can be viewed, often accompanied by advertisements. These platforms generate substantial revenue through advertising, capitalizing on the enduring popularity of college football without providing any share of the profits to the athletes involved. For example, clips from Classic University of Michigan games, such as the 1997 National Championship season, are monetized through these channels. Historic rivalries, including the epic University of Michigan vs. Ohio State battles, are frequently showcased, particularly memorable games like the 2006 "Game of the Century," which pitted #1 Ohio State against #2 Michigan in a clash for the ages.

64.     Other iconic moments include the 2004 triple-overtime thriller against Michigan State, the dramatic 2011 under-the-lights victory over Notre Dame, and

the unforgettable 1985 showdown against Nebraska. These games, along with the legendary 1991 matchup against Ohio State, are regularly replayed to attract viewers. Additionally, memorable events such as the last-second touchdown against Indiana in 1979, the record-setting rushing game against Ohio State in 1995, and the dramatic victory in the 2000 Orange Bowl against Alabama are prominently featured.

65.    Historic Bowl games, such as the 1989 Rose Bowl win against USC and the 1998 Rose Bowl victory over Washington State, further add to the rich tapestry of University of Michigan football lore. The intense 1997 battle against Penn State, dubbed "Judgment Day," and the 1999 win against Wisconsin are also highlighted. These historic highlights captivate audiences and drive significant advertising revenue, underscoring the NCAA's exploitation of these cherished moments without compensating the athletes who made them possible.

66.    The NCAA leverages its monopsony power in the market for student-athletes' labor to enforce exclusive control over their names, images, and likenesses. By conditioning eligibility on the surrender of publicity rights and prohibiting any form of compensation during their college careers, the NCAA ensures it remains the sole entity profiting from these rights. This practice is particularly evident in the Football Bowl Subdivision (FBS), where the University of Michigan's high-profile football program generates significant viewership and revenue.

{02126348-1 }

67.    Even after student-athletes have graduated, the NCAA, BTN, its partners, and affiliates continue to exploit their names, images, and likenesses. This ongoing use includes replays of historical moments, promotional content, and merchandise sales, all of which generate significant revenue for the NCAA, its partners, and affiliates without compensating the athletes. The ongoing promotion of Michigan's storied football history, featuring the Plaintiffs and other Class Members, illustrates this persistent exploitation.

68.    In addition to direct revenue from broadcasts and merchandise, the NCAA also profits by selling viewer information to third parties for advertising purposes. This monetization further illustrates the extensive commercial use of student-athletes' identities without their consent or compensation. Fans who follow University of Michigan athletics and interact with NCAA platforms contribute to this data pool, enhancing the NCAA's revenue streams at the expense of the student-athletes.

69.    The economic impact of these practices is substantial. The NCAA and its co-conspirators generate billions of dollars annually from the use of student-athletes' names, images, and likenesses. This revenue is a direct result of the uncompensated use of these athletes' identities, long after their college careers have ended. The University of Michigan, as a prominent FBS program, significantly contributes to this revenue through its large fan base and successful athletic

programs.

70.     The NCAA's practices constitute unjust enrichment and are a clear violation of antitrust laws. By artificially depressing the compensation for student-athletes' labor and monopolizing the market for their publicity rights, the NCAA has stifled competition and denied athletes their rightful earnings. This exploitation is evident in the careers of University of Michigan athletes, who have generated immense value for the NCAA and its partners without receiving fair compensation.

71.     This confirms that the NCAA's actions demonstrate a clear pattern of collusion to deny student-athletes the benefits of their publicity rights. By leveraging its monopoly power, the organization has created an environment where student-athletes are forced to comply with its exploitative practices or risk losing their athletic careers and educational opportunities. This systematic exploitation is contrary to the principles of equity and justice and requires immediate judicial intervention to protect the rights of student-athletes.

72.     The NCAA's exploitation extends beyond the athletes' collegiate careers, with the organization continuing to use their names, images, and likenesses for commercial purposes long after they have graduated. This perpetual license of NIL rights is an egregious violation of the athletes' rights and a clear indication of the NCAA's intent to profit indefinitely from their identities without providing any compensation.

{02126348-1 }

73.     The Plaintiffs, on behalf of a Class of similarly situated former NCAA student-athletes, seek not only to recover the compensation they are rightfully owed but also to establish legal precedents that will protect future generations of student-athletes from similar exploitation. This action aims to dismantle the entrenched practices of the NCAA and to ensure that the organization is held accountable for its systemic abuses.

74.     This Court must consider the profound impact of the NCAA's practices on the lives and careers of countless student-athletes. By depriving them of the ability to benefit from their own names, images, and likenesses, the NCAA has not only violated their legal rights but has also hindered their ability to secure financial stability and recognition for their contributions to collegiate sports.

75.     The relief sought in this action includes compensatory and punitive damages for the Plaintiffs, as well as injunctive relief to prevent the NCAA from continuing its exploitative practices. The Plaintiffs also seek a declaration that the NCAA's practices are unlawful and that the organization must revise its Bylaws and policies to ensure that student-athletes are fairly compensated for the commercial use of their names, images, and likenesses.

## CLASS ALLEGATIONS

76.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

77.    Plaintiffs bring this action on behalf of former NCAA student-athletes under Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class, defined as:

> All persons who were NCAA student-athletes prior to June 15, 2016, whose image or likeness has been used in any video posted by or licensed by the NCAA, Big Ten Network, or their agents, distributors, contractors, licensees, subsidiaries, affiliates, partners, or anyone acting in concert with any of the foregoing entities or persons.

78.    Plaintiffs seek a declaration that any assignment of publicity rights is unlawful and unenforceable, a declaration of entitlement to a present and future share of any revenue generated from the use of their publicity rights, including but not limited to the use of their name, image, and likeness, and injunctive relief barring Defendants from using the same absent reasonable remuneration.

79.    On behalf of the members of the Class, Plaintiffs seek compensation for any revenue generated from the use of their past publicity rights, including but not limited to the use of their name, image, and likeness during their period of eligibility and after, including without limitation, through licensing, marketing, promotion, online, or other income streams that Class Members would have received absent Defendants' unlawful conduct.

80.    Plaintiffs seek certification of a nationwide Class for their antitrust claims (First,  Second, and Third Counts, infra) and a nationwide Class for their unjust enrichment claims (Fourth Counts, infra).

{02126348-1 }

81.    Excluded from the Class are any officers, directors, and employees of the Defendants.

82.    Also excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendants and any entity in which Defendants have a controlling interest or has a controlling interest in Defendants and its legal representatives, successors and assigns; and (c) all persons and entities who properly execute and file a timely request for exclusion from the Class.

83.    ***Numerosity***: Plaintiffs are unable to provide a specific number of members in the Class because that information is solely in the possession of Defendants. However, the exact number of Class Members, including the names and addresses of all Class Members, will be easily ascertained through a review of Defendants' business records. Upon information and belief, each Class contains thousands of members and is therefore so numerous that joinder of all members would be impracticable.

84.    ***Commonality***: Common questions of law and fact predominate over any individual issues that may be presented because Defendants tacitly admit they have engaged in the conduct set forth above (*NCAA v. Alston*, 594 U.S. at 86 (2021)). Thus, the common questions of law and fact are:

> a.  Whether Defendants engaged in a contract, combination, and
>     conspiracy, consisting of horizontal and vertical agreements

36

that artificially depress prices in the market for student-athletes' labor, fixing those prices near zero;

b. Whether such contract, combination, and conspiracy, consisting of horizontal and vertical agreements, is enforceable;

c. Whether Defendants illegally agreed to exploit student-athletes by using their monopoly power to force student-athletes to give up their legal right of publicity and control of their name, image, and likeness; asserting a perpetual license of student-athletes' NIL rights; and appropriating those rights for decades, long after the athletes have completed their collegiate careers;

d. Whether such conduct caused the Class to receive less, or near zero compensation, than they would have for the use of their publicity rights, including name, image, and likeness in a competitive market;

e. Whether Defendants violated Section I of the Sherman Act;

f. Whether the Defendants and their co-conspirators' conduct caused injury to Plaintiffs and the Class;

g. Whether the Plaintiffs and Class are entitled to declaratory and injunctive relief;

h. Whether and to what extent Plaintiffs and the Class are entitled to damages;

i. Whether Defendants have been unjustly enriched.

85. The commonality requirement is satisfied when there are questions of law or fact common to the Class. In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Supreme Court noted that commonality requires the plaintiff to

{02126348-1 }

demonstrate that the Class members have suffered the same injury. Here, all Class Members suffered the same injury of having their publicity rights unlawfully exploited by the Defendants without compensation.

86.     *Typicality*: The claims of Plaintiffs are typical of the claims of the Class, and all are based on the same facts and legal theories, as all such claims arise out of Defendants' unlawful conduct. The typicality requirement ensures that the claims of the Class Representatives are typical of those of the Class. In *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982), the Supreme Court held that typicality is satisfied when the Class representatives' claims arise from the same event, practice, or course of conduct that gives rise to the claims of the other Class Members.

87.     **Adequacy:** Plaintiffs are adequate representatives of the Class and will protect the claims and interests of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex Class actions. Neither Plaintiffs nor counsel have interests that conflict with those of the Class and will vigorously prosecute the claims alleged herein. Plaintiffs are aware of their responsibilities and have accepted such responsibilities. Adequacy is met when the Class Representatives have common interests with the unnamed members of the Class and will vigorously prosecute the interests of the Class through qualified counsel. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

{02126348-1 }

88.  *Predominance and Superiority*: The Class is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. A class action is superior to other methods for the fair and efficient resolution of this controversy. The Class action device presents fewer management difficulties and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each member of the Class are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent Class certification, it would not be feasible for Plaintiffs and members of the Class to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the Class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

89.  Predominance and superiority are met when the proposed Class Members' claims are based on a common nucleus of operative facts and when a Class action is a superior method for adjudicating the controversy. In *Amchem*

{02126348-1 }

*Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court emphasized that predominance tests whether proposed Classes are sufficiently cohesive to warrant adjudication by representation. Here, the Defendants' conduct affected all Class Members in the same manner, making Class action adjudication appropriate.

90.     Defendants have acted or refused to act on grounds generally applicable to the members of the Declaratory and Injunctive Relief Class, thereby making final injunctive relief appropriate for the members of the Declaratory and Injunctive Relief Class as a whole.

91.     Class certification is warranted where the party opposing the Class has acted or refused to act on grounds that apply generally to the Class, making injunctive or declaratory relief appropriate, respecting the Class as a whole. The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), clarified that Rule 23(b)(2) applies when a single injunction or declaratory judgment would provide relief to each member of the Class. The Defendants' systemic exploitation of student-athletes' publicity rights without compensation is precisely the type of conduct that justifies Class-wide injunctive relief.

92.     The NCAA and its co-conspirators, members, and partners engaged in a contract, combination, and conspiracy, consisting of horizontal and vertical agreements, understanding, and concert of action, that artificially depress prices in the market for student-athletes' labor, fixing those prices near zero. This systematic

{02126348-1 }

collusion has deprived student-athletes of fair market compensation for their labor and contributions.

93.    The NCAA and its members enjoy a monopsony (i.e., a buyer-side monopoly) in the market for student-athletes' labor because no reasonable substitute exists for the elite athletic and academic opportunities offered by Division I schools. This monopsony power allows the NCAA to dictate terms and conditions to student-athletes without competition.

94.    The NCAA leverages its monopsony power in the market for student-athletes' labor to give itself a monopoly in the market for student-athletes' names, images, and likenesses. By controlling both the labor and the publicity rights markets, the NCAA can exploit student-athletes without providing them fair compensation.

95.    By conditioning student-athletes' eligibility to play on their surrender of their publicity rights for the duration of their college careers; prohibiting student-athletes from receiving any compensation for their name, image, and likeness rights during their college careers; and continuing to appropriate those rights long after students have graduated and ostensibly moved beyond the reach of the NCAA, the NCAA has made itself the sole source for collegiate athlete names, images, and likenesses—even for athletes who graduated decades ago.

96.    Thus, the NCAA has acquired both monopsony power, pushing the

{02126348-1 }

price of student-athlete names, images, and likenesses to zero when it acquires them, and monopoly power, making itself the only seller in the market for those names, images, and likenesses. This dual market control severely limits the economic opportunities available to student-athletes.

97.    These actions, which are ongoing and continue to this day, constitute an unreasonable restraint of trade that eliminated competition in the market for former student-athletes' name, image, and likeness rights. This restraint of trade is a clear violation of antitrust laws, as it stifles competition and innovation in the market.

98.    Furthermore, the NCAA's conduct constitutes an unlawful exercise of its monopoly power to stifle competition and unreasonably restrain trade. By maintaining this control, the NCAA has hindered the ability of former student-athletes to capitalize on their own identities, which is an antitrust injury.

99.    Defendants are estopped from relying on any limitations or disclaimers as a defense to Plaintiffs' and Class Members' claims. Defendants knew or should have known that the acts complained herein were a violation of antitrust laws and offend the reasonable expectations of Plaintiffs and Class Members and have been continuous and ongoing for decades. Thus, Defendants' own conduct precludes them from relying on the statute of limitations.

100.    Plaintiffs and Class Members are entitled to equitable tolling of their

{02126348-1 }

claims from the date of the first unlawful act of Defendants and their co-conspirators, including without limitation the requirement that Plaintiffs and Class Members sign away publicity rights, barely at the age of maturity, an extraordinary circumstance that prevented Plaintiffs from pursuing their rights, initially within the first act's limitations period, and the harm is ongoing and continuous to this day.

101.   Plaintiffs and Class Members are entitled to invoke the continuing violations doctrine because although, upon information and belief, Plaintiffs signed away their respective publicity rights at the time they played sports for their respective schools, Defendants' actions, subsequent and continuing, are repeated violations of Section 1 of the Sherman Act, such that with each continuing violation, the statute of limitations has been repeatedly restarted since the advent of Plaintiffs and Class Members work as NCAA student-athletes.

102.   The relevant markets are the nationwide markets for the labor of NCAA college athletes in the sports in which they compete. In these labor markets, current and prospective student-athletes compete for roster spots on the various athletic teams. NCAA member institutions recruit and retain the best student-athletes by offering bundles of goods and services including scholarships to cover the cost of attendance, education-related benefits and awards, as well as access to the athletic training facilities, coaching, medical treatment, and opportunities to compete at the highest levels of college sports in front of large crowds and television audiences.

{02126348-1 }

103.   All former NCAA student-athletes have been denied the opportunity to pursue economic benefits in a competitive market, free of the NCAA's restraints. This antitrust injury to the Class is exacerbated by the reality that only a small percentage of former college athletes had careers in professional athletics and those that did often had very short careers. For many former student-athletes, college is where the value of their athletic skill was at, or close to, its peak and was an optimal time to realize that value. However, the NCAA's anticompetitive restraints prohibited them from doing so.

104.   Accordingly, on behalf of a Class of all NCAA student-athletes, Plaintiffs request a declaratory judgment that the NCAA's rules are unlawful as well as an injunction permanently enjoining the NCAA from continuing its exploitative practices.

**COUNT I**
**UNREASONABLE RESTRAINT OF TRADE**
***Violation of Section 1 of the Sherman Act,***
***15 U.S.C. § 1***

105.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

106.   15 U.S.C. § 1 provides, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be

{02126348-1 }

illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

107.   The NCAA and the Big Ten Network, by and through Defendants' co-conspirators, officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to artificially depress to near zero the price for the use of, and to limit supply for, licensing and sale of Plaintiffs' and Class Members' publicity rights, including names, images, and/or likenesses, in the relevant market, nationwide, in violation of Section 1 of the Sherman Act.

108.   The Supreme Court has long recognized that Section 1 of the Sherman Act targets concerted anticompetitive behavior that unreasonably restrains trade. In *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911), the court clarified that only unreasonable restraints of trade are prohibited. Further elaboration on what constitutes an unreasonable restraint was provided in *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984), where the court held that the NCAA's control over television contracts and broadcast rights constituted a restraint of trade.

109.   The NCAA rules and practices—including the requirements that

student-athletes sign away their names, images, likenesses, and publicity rights (collectively "publicity rights") to the NCAA—and the agreement among the NCAA and its named and unnamed co-conspirators, including its member institutions, to adhere to these rules constitute a contract or combination between the NCAA, its member institutions, and its partners and co-conspirators in restraint of trade in the market for student-athlete services.

110.   The Sherman Act condemns not only the agreements that are express but also those that are implied or tacit. The NCAA's agreement with its member institutions and partners to impose uniform rules on the waiver of publicity rights is a textbook example of a combination that restrains trade. This combination is horizontal (among the member institutions) and vertical (between the NCAA and its partners), both of which are, per se, unlawful under antitrust law.

111.   This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in and will, until restrained, continue to result in anti-competitive effects, including inter alia: (a) fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels since Plaintiffs and Class Members have been unable to negotiate for compensation in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market.

112.   The NCAA and BTN have imposed a regime of restrictive agreements

{02126348-1 }

that artificially fixed the value of Plaintiffs' NIL at zero, resulting in profound economic harm. In a free market, Plaintiffs would have had the ability to negotiate and profit from their NIL through endorsements, licensing, and commercial ventures. The NCAA's anticompetitive practices, however, ensured that Plaintiffs were unable to access these economic opportunities. The value of their NIL was siphoned off by the NCAA and BTN to generate billions in revenue from broadcasts, promotions, and merchandise. The NCAA's monopolistic control over student-athlete NIL rights has caused a significant antitrust injury by suppressing competition and denying Plaintiffs any market-based compensation for their contributions, thus violating the core principles of antitrust law.

113.   The antitrust injury in this case is evident. The Supreme Court in *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010), stated, "Decisions by NFL teams to license their separately owned trademarks collectively and to only one vendor are decisions that 'depriv[e] the marketplace of independent centers of decision making,' and therefore of actual or potential competition." This reaffirmed that antitrust injury is a foregone conclusion when market participants collude to deny market benefits to a particular group. Here, the market participants (NCAA, its member institutions, and broadcasting partners) have colluded to deny fair market compensation for the publicity rights of student-athletes, causing a direct antitrust injury.

{02126348-1 }

114.   Recent legal precedents further solidify Plaintiffs' claims against the NCAA and BTN. In *NCAA v. Alston*, the Supreme Court highlighted the NCAA's unlawful use of monopsony power to artificially suppress compensation for student-athletes, finding that the organization's restrictions harmed competition. The decision reaffirmed that the NCAA cannot justify its blanket restrictions under the guise of preserving "amateurism." Similarly, in *O'Bannon v. NCAA*, the courts ruled that the NCAA's prohibition on athlete compensation for the use of their NIL violated antitrust laws. These cases, alongside others, establish that the NCAA's policies constitute an unreasonable restraint of trade, depriving Plaintiffs and Class Members of their rights to fair compensation for the commercialization of their NIL.

115.   The NCAA and its partners, co-conspirators, and member institutions deploy their market power, via NCAA rules, to reduce the cost of student-athletes' publicity rights to zero.

116.   The NCAA's illegal conduct has deprived Plaintiffs of substantial profits they would otherwise have earned from their publicity rights.

117.   The NCAA's illegal conduct has damaged Plaintiffs by diminishing their opportunity to maximize their compensation for their publicity rights, including their rights related to images related to the most profitable portion of NCAA's revenue, football.

118.   The full amount of this damage is currently unknown, and it continues

{02126348-1 }

to increase as the NCAA and its affiliates and co-conspirators continue to profit from the NCAA's ongoing, uninterrupted usurpation of Plaintiffs' and Class Members' publicity rights.

119.   The NCAA has damaged and continues to damage Plaintiffs to this day by earning revenue from advertisers who pay for placements on NCAA.com and/or the NCAA's YouTube channels, which are shown to viewers before they are allowed to view videos of Plaintiffs and the Class.

120.   The NCAA has used videos of Plaintiffs and the Class—without Plaintiffs' consent and without compensating Plaintiffs or other Class Members—in commercial advertising since the time that they played in the NCAA, up to and including this year.

121.   The NCAA's requirement that student-athletes assign their publicity rights to the NCAA is not justified by any procompetitive objective. The NCAA's publicly stated goals in creating the rules are mere pretext; the rules serve only to allow the NCAA to maximize its profit from student-athletes' uncompensated labor in the only labor market available to them.

122.   The Supreme Court in *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), highlighted that procompetitive justifications must have a factual basis and cannot be merely hypothetical. The NCAA's justification for its restraint of trade under the guise of preserving

49

"amateurism" fails this test, as it does not foster competition or enhance consumer welfare but rather stifles economic opportunities for student-athletes.

123.   Even if there were any shred of procompetitive benefit to the NCAA unreasonably forcing student-athletes to assign their publicity rights to the NCAA, and to the NCAA's assumption that those rights have been surrendered in perpetuity, numerous less restrictive alternatives could accomplish any procompetitive objective the NCAA could articulate.

124.   A genuine case or controversy exists between Plaintiffs and Defendants regarding the legality of the NCAA's requirement that student-athletes assign their publicity rights to the NCAA without compensation.

125.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs and Members of the Class have suffered injury to their business or property and have been deprived of the benefits of free and fair competition. Absent Defendants' conduct, Plaintiffs and Class Members would have received a competitive share of the revenue being brought into the NCAA and their co-conspirators from Plaintiffs' and Class Members' labor. As a result, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

126.   The Supreme Court in *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), reaffirmed that agreements to allocate markets and fix prices are per se

{02126348-1 }

violations of the Sherman Act. The NCAA's practices fall squarely within this precedent, as they involve horizontal agreements among competitors (NCAA member institutions) to fix the price of student-athletes' publicity rights at zero.

127.   For the reasons set forth above, Plaintiffs and the Class are entitled to a declaratory judgment that any assignment of publicity rights under the circumstances in which the NCAA presents its required waiver to students is unlawful and unenforceable.

128.   Plaintiffs and the Class are also entitled to a permanent injunction enjoining the NCAA and any person acting through it from relying on any unenforceable assignment of publicity rights.

129.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured and financially damaged, including without limitation, lost profits, less or near zero compensation, precisely the type of injuries antitrust laws were designed to prevent, making Defendants' conduct an unlawful restraint of trade.

130.   Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover treble the amount of actual damages as well as their reasonable attorneys' fees and costs.

131.   Plaintiffs and the Class are further entitled to a permanent injunction terminating the ongoing violations alleged in this Complaint.

{02126348-1 }

**COUNT II**
**UNREASONABLE RESTRAINT OF TRADE**
**GROUP BOYCOTT/REFUSAL TO DEAL**
***Violation of Section 1 of the Sherman***
***Act, 15 U.S.C. § 1***

132.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

133.   15 U.S.C. § 1 provides, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal."

134.   Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Class Members from being compensated for the use of their images, likenesses, and/or names and/or their concerted refusal to permit compensation to be paid to Members of the Class for the use of their images, likenesses, and/or names, in violation of Section 1 of the Sherman Act.

135.   The Supreme Court has consistently recognized that group boycotts are per se illegal under Section 1 of the Sherman Act. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), the court held that group boycotts and concerted refusals to deal are per se unlawful because they tend to restrict competition and control prices. The NCAA's practices fall squarely within this precedent, as they involve agreements among competitors (member institutions and broadcasting partners) to prevent student-athletes from receiving fair market compensation for

{02126348-1 }

their publicity rights.

136.    Defendants' group boycott/refusal to deal also includes Defendants' ongoing concerted action to deny Class Members compensation in the form of royalties for the continued use of their images, likenesses, and/or names for profit.

137.    The NCAA possesses monopsony and monopoly power in the market for student-athlete labor and services. The NCAA's control over the market for student-athlete labor is nearly absolute, as it regulates the terms and conditions under which student-athletes can participate in intercollegiate sports. This control extends to the use of student-athletes' publicity rights, which the NCAA and its member institutions have monopolized through their restrictive agreements and practices.

138.    Through its rules and practices, the NCAA wields its monopsony power willfully to quash competition and drive the cost of student-athletes' labor down to zero. The NCAA's rules require student-athletes to relinquish their publicity rights as a condition of participation, effectively eliminating any competition for those rights and ensuring that student-athletes cannot negotiate for fair compensation.

139.    The NCAA uses its monopsony power to further exploit student-athletes by forcing them to assign their publicity rights to the NCAA, and then assuming that that assignment is perpetual. This perpetual assignment of rights prevents student-athletes from ever reclaiming control over their own identities and from receiving compensation for the commercial use of their names, images, and

{02126348-1 }

likenesses.

140. The NCAA has always conditioned eligibility to play on the relinquishment, to the NCAA and its members by the athlete, of all rights to be compensated for his or her image, likeness, and/or name associated with the playing of those sports. This practice not only restrains trade but also constitutes a group boycott and refusal to deal, as it prevents any entity from compensating student-athletes for their publicity rights without violating NCAA rules.

141. This practice perpetuates the NCAA's monopoly power in the market for student-athlete labor and in other markets by consolidating relevant assets—the publicity rights of well-known athletes—under its control at zero cost. The Supreme Court in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), stated that such control over market assets, coupled with restrictive agreements that limit market competition, constitutes an unlawful restraint of trade.

142. Thus, the NCAA's monopoly power is not the result of growth or development as a consequence of a superior product, business acumen, or historical accident but instead of a deliberate course of conduct aimed at eliminating competition. This conduct includes leveraging its monopoly power to enforce agreements among its member institutions and broadcasting partners to exclude student-athletes from the marketplace for their own publicity rights. Co-Defendant Big Ten Network is an intended beneficiary of this.

54

143.   The NCAA's group boycott/refusal to deal has the direct purpose and effect of excluding student-athletes from the marketplace for their own names, images, and likenesses. This exclusion is a per se violation of the Sherman Act as defined in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), which established that group boycotts that deny market access are illegal per se.

144.   There is no valid procompetitive reason for the NCAA to require student-athletes to assign their publicity rights to the NCAA in perpetuity. The Supreme Court in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), indicated that any claimed procompetitive justification must demonstrate actual benefits to consumers or competition. The NCAA's justification of maintaining "amateurism" does not meet this standard, as it does not enhance consumer welfare or promote competition, but rather suppresses it.

145.   Rather, the purpose of this requirement is to allow the NCAA to extract maximum profit from the uncompensated labor of student-athletes, taking full advantage of its monopoly power to derive further profits for itself. This profit extraction is achieved by ensuring that student-athletes cannot monetize their own publicity rights, thus directing all revenue from such commercialization to the NCAA and its partners.

146.   The NCAA has leveraged its monopoly power by unlawfully requiring

that all member institutions enforce the requirement that student-athletes assign their publicity rights to the NCAA in perpetuity. This enforcement mechanism ensures that no member institution can deviate from the restrictive agreements, thereby maintaining the NCAA's control over the market for student-athlete publicity rights.

147.   This requirement has allowed the NCAA to leverage its labor-side monopsony to create additional profits and power—and also monopoly power—in the separate market for media licensing of game footage, images, and accounts. The Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), condemned such leveraging of monopoly power to exclude competition in adjacent markets.

148.   Defendants have leveraged their power in a concerted action to deny Class Members compensation in the form of royalties for the continued use of their images, likenesses, and/or names for profit. This concerted action includes agreements among the NCAA, its member institutions, and broadcasting partners to exclude student-athletes from any share of the revenue generated from the commercial use of their publicity rights.

149.   Defendants' power is an unlawful restraint on trade and a violation of Section 1 of the Sherman Act as a group boycott and/or refusal to deal. The Supreme Court in *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457 (1941), held that concerted refusals to deal that eliminate competition and control prices

{02126348-1 }

constitute per se violations of antitrust laws. The NCAA's practices are analogous, as they control the price of student-athletes' publicity rights by fixing it at zero.

150.   The NCAA's eligibility rules and Bylaws act as a threat of a group boycott to force all Class Members, including Plaintiffs, to abide by the NCAA's rules. Plaintiffs and Class Members received less compensation, near zero, and substantially fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets and thus suffered antitrust injuries.

151.   The NCAA has always conditioned eligibility on the relinquishment, to the NCAA and its members by the student-athlete, of all rights to be compensated for their athletic services (except in limited circumstances) arbitrarily dictated by the NCAA and enforced by the NCAA. This conditioning of eligibility on the waiver of publicity rights constitutes an unreasonable restraint of trade and a group boycott, as it prevents student-athletes from participating in intercollegiate sports unless they agree to the NCAA's terms.

152.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs and Members of the Class have suffered injury to their business or property and have been deprived of the benefits of free and fair competition. Absent Defendants' conduct, Plaintiffs and Class Members would have

{02126348-1 }

received a competitive share of the revenue being brought into the NCAA and their co-conspirators from Plaintiffs' and Class Members' labor. As a result, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

153.   The Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), established that actions to maintain monopoly power through restrictive agreements and exclusionary practices are per se violations of the Sherman Act. The NCAA's agreements and practices to exclude student-athletes from receiving compensation for their publicity rights fit within this framework.

154.   For the reasons set forth above, Plaintiffs and the Class are entitled to a declaratory judgment that any assignment of publicity rights, under the circumstances in which the NCAA presents its required waiver to student-athletes, is unlawful and unenforceable.

155.   Plaintiffs and the Class are also entitled to a permanent injunction enjoining the NCAA and any person acting through it from relying on any unenforceable assignment of publicity rights.

156.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured and financially damaged, including without limitation, lost profits, less or near zero compensation, precisely the type of injuries antitrust laws were designed to prevent, making Defendants' conduct an unlawful restraint of trade.

{02126348-1 }

157.    Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover treble the amount of actual damages, as well as their reasonable attorneys' fees and costs.

158.    Plaintiffs and the Class are further entitled to a permanent injunction terminating the ongoing violations alleged in this Complaint.

## COUNT III
## CONSPIRACY TO RESTRAIN TRADE
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

159.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

160.    Defendants NCAA, BTN, and their known and unknown co-conspirators have engaged in a continuing contract, combination, and conspiracy to restrain trade in violation of Section 1 of the Sherman Act. Through their officers, directors, employees, agents, or other representatives, the Defendants have entered a concerted action to artificially depress to near zero the price for the use of and to limit the supply for, licensing, and sale of Plaintiffs' and Class Members' publicity rights, including names, images, and likenesses. The purpose of this conspiracy was, and is, to maximize the profits of the NCAA and its co-conspirators by unlawfully restraining trade and suppressing competition in the market for the licensing and sale of student-athletes' publicity rights. This conspiracy has been in operation for many years and continues to this day, affecting countless former and current student-

59

athletes.

161.    The conspiracy involves several mechanisms, including but not limited to requiring student-athletes to sign forms that transfer their publicity rights to the NCAA as a non-negotiable condition of participation, imposing rules and regulations that prohibit student-athletes from receiving any compensation for the use of their names, images, and likenesses during their college careers, enforcing these rules through a combination of threats, coercion, and the promise of eligibility to compete in collegiate athletics, and continuing to exploit the publicity rights of former student-athletes long after their college careers have ended without providing any compensation.

162.    This combination and conspiracy by Defendants have resulted in and will continue to result in anti-competitive effects, including fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels, as Plaintiffs and Class Members have been unable to negotiate for compensation in a free market; eliminating or suppressing to a substantial degree competition among Defendants for skilled labor in the market, and depriving Plaintiffs and Class Members of the economic benefits that would result from a competitive market for their publicity rights. The NCAA's requirement that student-athletes assign their publicity rights to the NCAA is not justified by any procompetitive objective. The publicized goals of preserving "amateurism" are merely pretextual and serve only to maximize the

{02126348-1 }

NCAA's profits from the uncompensated labor of student-athletes. These practices do not promote competition or consumer welfare but instead stifle economic opportunities for student-athletes.

163.    The combination, agreement, and conspiracy described herein constitute an unlawful restraint of trade that has harmed Plaintiffs and Class Members by depriving them of the benefits of free and fair competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured in their business or property, including lost profits and diminished compensation opportunities. Defendants have perpetuated this conspiracy through ongoing and continuous conduct, including utilizing their monopsony power in the market for student-athletes' labor to enforce the assignment of publicity rights, continuing to exploit the names, images, and likenesses of former student-athletes in various media platforms, advertisements, and merchandise without compensation, and engaging in public relations campaigns that falsely portray their practices as beneficial to student-athletes and essential for the preservation of amateurism.

164.    The Supreme Court has long recognized that concerted anticompetitive behavior that unreasonably restrains trade is prohibited under the Sherman Act. In *Standard Oil Co. of New Jersey v. United States*, the court clarified that only unreasonable restraints of trade are prohibited. Further, in *American Needle Inc. v. National Football League*, the court stated that decisions by market participants to

{02126348-1 }

license their trademarks collectively and to only one vendor are decisions that deprive the marketplace of independent centers of decision-making and, therefore, of actual or potential competition. The conduct of the NCAA and its co-conspirators fits squarely within these precedents.

165.    Plaintiffs and the Class seek treble damages pursuant to Section 4 of the Clayton Act, injunctive relief to prevent further anticompetitive conduct, and a declaration that any assignment of publicity rights under the circumstances in which the NCAA presents its required waiver to students is unlawful and unenforceable. Specifically, Plaintiffs and the Class request a declaration that Defendants' actions constitute violations of Section 1 of the Sherman Act; an order enjoining Defendants from continuing to enforce the assignment of publicity rights without fair compensation; an award of treble damages to compensate Plaintiffs and the Class for the economic harm suffered as a result of Defendants' unlawful conduct; restitution and disgorgement of all profits earned by Defendants through the use of Plaintiffs' and Class Members' names, images, and likenesses; and an award of reasonable attorneys' fees, costs, and expenses incurred in this action.

{02126348-1 }

## COUNT IV
## UNJUST ENRICHMENT

166.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

167.   Defendants have been unjustly enriched by the use of Plaintiffs' and Class Members' names, images, and likenesses without compensation. Unjust enrichment occurs when one party retains a benefit which in equity and good conscience belongs to another. The Defendants' actions have allowed them to amass substantial profits from the commercialization of the Plaintiffs' identities, all while depriving the Plaintiffs of their rightful earnings.

168.   Plaintiffs and Class Members have conferred a benefit upon Defendants by allowing them to use their names, images, and likenesses to generate revenue. This revenue includes, but is not limited to, advertising dollars, merchandise sales, video game licensing, and media rights deals. The extent of this benefit is vast, considering the immense popularity and commercial success of college sports, particularly NCAA football.

169.   Defendants have knowingly and willingly accepted and retained this benefit under circumstances that make it inequitable for them to retain the benefit without paying for its value. The principle of unjust enrichment requires restitution to the party who conferred the benefit when retention of the benefit without payment would be unjust. Here, the Defendants' retention of benefits derived from the

{02126348-1 }

Plaintiffs' publicity rights without compensation clearly constitutes unjust enrichment.

170.    In *Rogers v. Hough*, 101 F.2d 396 (9th Cir. 1939), the court emphasized that when one party benefits from the efforts and expenditures of another, equity demands that the benefitted party pay for the value of what it has received. The Defendants in this case have profited immensely from the Plaintiffs' and Class Member's athletic performances and public personas without providing any form of compensation, directly contravening this principle.

171.    The Supreme Court in *Midland Insurance Co. v. Central Hanover Bank & Trust Co.*, 234 N.Y. 304 (1922), articulated that unjust enrichment does not require wrongful conduct by the benefitting party but simply that the circumstances are such that equity and good conscience demand restitution. The NCAA's systematic exploitation of student-athletes' publicity rights, though institutionalized through its rules and practices, constitutes such circumstances.

172.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class Members have suffered injury and financial damage, including lost profits and less or near zero compensation for the use of their names, images, and likenesses. This deprivation of rightful earnings has had significant financial and personal impacts on the Plaintiffs, who have been unable to capitalize on their own identities while seeing their contributions generate substantial wealth for the

{02126348-1 }

Defendants.

173. Plaintiffs and Class Members are entitled to restitution and/or disgorgement of all profits earned by Defendants through the use of their names, images, and likenesses. Restitution is a remedy designed to prevent unjust enrichment by restoring the injured party to the position they would have been in had the enrichment not occurred. In this case, it requires the Defendants to return the profits they have wrongfully retained.

174. The measure of restitution in this case should include all profits derived from the commercial use of Plaintiffs' and Class Members' publicity rights, reflecting the full extent of the benefit conferred. The Supreme Court in *CFTC v. Schor*, 478 U.S. 833 (1986), confirmed that equitable remedies such as disgorgement are appropriate to deprive wrongdoers of their ill-gotten gains and to restore the status quo.

175. Plaintiffs and Class Members are further entitled to a permanent injunction enjoining Defendants from continuing to use their names, images, and likenesses without compensation. The ongoing exploitation of Plaintiffs' identities without remuneration constitutes a continuous wrong that equity demands be halted.

176. In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court affirmed that injunctive relief is appropriate where legal remedies are inadequate to address ongoing harm. Here, a permanent injunction is necessary

{02126348-1 }

to prevent further unjust enrichment and to protect the Plaintiffs' rights to control and benefit from their own publicity rights.

## **DAMAGES INCURRED**

177.   The foregoing paragraphs are incorporated by reference as if fully set forth herein.

178.   Plaintiffs and Class Members have suffered significant financial harm due to the Defendants' unlawful and systematic commercialization of their NIL. This damage includes both the past and ongoing unauthorized use of their identities. For years, the NCAA, BTN, and their affiliates have leveraged Plaintiffs' NIL for profit through broadcasts, advertisements, merchandising, and other commercial ventures—without any form of compensation to the athletes themselves. This unjust enrichment extends into the future, as the Defendants continue to exploit Plaintiffs' NIL through perpetual replays and promotional content. The relief sought in this action aims to ensure that all past and future uses of Plaintiffs' NIL are fairly compensated, thus rectifying the continuing exploitation that has deprived Plaintiffs of rightful economic benefits. The damages incurred include, but are not limited to, the following:

   a.   **Loss of Market Value for NIL Rights**: The NCAA's restrictions prevented student-athletes from realizing the full market value of their NIL rights during their playing years. Student-athletes were unable to enter into profitable agreements to endorse products,

appear in advertisements, or license their likeness for various uses. This deprivation directly impacted their ability to generate income from their personal brands, a common revenue stream for athletes. By comparing market data and potential deals available to similar athletes in unrestricted environments, the lost market value of these NIL rights can be monetized, demonstrating the financial harm caused by these restrictions. Plaintiffs seek compensatory damages for the lost market value of their NIL rights.

b.   **Suppressed Earnings from Endorsements**: Due to NCAA rules, student-athletes could not secure lucrative endorsement deals with brands, which are a common revenue stream for athletes in unrestricted markets. These deals often include sponsorships for sports apparel, beverages, and other products. The inability to capitalize on such opportunities resulted in significant financial losses. By assessing typical market rates for similar endorsement agreements and projecting potential earnings, the suppressed earnings from endorsements can be quantified, highlighting the economic impact of these missed opportunities. Plaintiffs seek compensatory damages for the suppressed earnings from endorsements.

c.   **Missed Opportunities for Media Appearances**: The NCAA's restrictions prevented student-athletes from earning income through media appearances, such as television interviews, commercials, and public speaking engagements, which are significant revenue sources for high-profile athletes. This resulted in lost opportunities for athletes to monetize their fame and visibility. Estimating the lost earnings by comparing typical fees for media appearances for similar athletes will highlight the financial impact of these missed opportunities, emphasizing the substantial revenue streams that were denied to the athletes. Plaintiffs seek compensatory damages for missed opportunities for media appearances.

d.   **Uncompensated Use of Likeness in Merchandise**: The NCAA, its partners, and affiliates used student-athletes' names and likenesses in merchandise, such as jerseys, video games, and other products, without providing any compensation to the

{02126348-1 }

athletes. This unauthorized use resulted in significant profits for the NCAA while depriving athletes of their rightful share of the earnings. Calculating a percentage of the profits generated from merchandise sales that used the student-athletes' likenesses will provide a clear financial quantification of the unjust enrichment experienced by the NCAA. This demonstrates the substantial profits made from the student-athletes' identities without their consent or compensation. Plaintiffs seek disgorgement of profits from the uncompensated use of their likenesses in merchandise.

e.    **Revenue from Archived Footage and Highlight Reels**: The NCAA continues to profit from archived footage and highlight reels that feature former student-athletes, using them in various media formats without compensating the athletes. The ongoing commercial use of these performances generates substantial advertising and licensing revenue. Determining the advertising revenue generated from these media and claiming a share based on the frequency and duration of usage of the athletes' likenesses will demonstrate the ongoing financial benefits to the NCAA from past athletes' performances, underscoring the continuous exploitation of the athletes' achievements. Plaintiffs seek a share of the revenue generated from archived footage and highlight reels.

f.    **Lost Licensing Opportunities**: Because of NCAA policies, student-athletes were unable to license their names and likenesses for various products and services, a potential revenue stream denied to them. This restriction prevented student-athletes from entering into lucrative licensing agreements. By assessing potential licensing fees and calculating total lost earnings based on market rates for licensing deals, the financial impact of these missed opportunities can be monetized, showing the significant financial loss from prevented licensing opportunities. Plaintiffs seek compensatory damages for lost licensing opportunities.

g.    **Economic Loss from NIL Suppression**: The overall economic loss from the suppression of NIL rights includes all missed financial opportunities that student-athletes could have capitalized on, such as endorsements, merchandise, and media appearances. Aggregating the estimated earnings lost by all Class

68

Members and using statistical models to project the total economic loss will quantify the broad economic impact of NIL suppression across the entire Class. This collective impact illustrates the extensive financial damage caused to all affected athletes. Plaintiffs seek compensatory damages for the aggregate economic loss from NIL suppression.

h.    **Unfair Competitive Disadvantage**: Student-athletes were at a competitive disadvantage compared to those in jurisdictions without NIL restrictions, affecting their marketability and overall career prospects. This competitive disadvantage resulted in reduced earnings potential and career opportunities. Calculating the financial impact of this competitive disadvantage, including reduced marketability and earnings potential, will illustrate how NCAA policies placed student-athletes at a disadvantage, impacting their professional development and financial future. Plaintiffs seek compensatory damages for the competitive disadvantage imposed by NCAA policies.

i.    **Loss of Future Earnings Potential**: The inability to build a personal brand during college can significantly impact an athlete's future earnings potential and career opportunities. Establishing a strong personal brand during their college years could have led to substantial long-term financial benefits. Projecting the long-term financial impact and potential future earnings lost due to the inability to build a personal brand will demonstrate the significant future earnings potential that was denied to these athletes, highlighting the prolonged financial impact on their careers. Plaintiffs seek compensatory damages for the loss of future earnings potential.

j.    **Unjust Enrichment**: The NCAA's profits from using student-athletes' NIL without compensation represent unjust enrichment that should be rectified. The unauthorized use of athletes' NILs generated significant profits for the NCAA, which were unjustly retained. Seeking disgorgement of profits and establishing a fund for equitable distribution to the student-athletes who were exploited will rectify the financial gain made by the NCAA at the expense of the student-athletes, ensuring fair compensation for the exploitation of their identities. Plaintiffs seek disgorgement

{02126348-1 }

of unjustly retained profits and equitable distribution to the athletes.

k.      **Retroactive Compensation for Historical Use**: The NCAA has historically used student-athletes' NILs without providing compensation. Retroactive claims can address this past usage by documenting instances where former student-athletes' NILs were used in video games, merchandise, and media without their consent. The cumulative revenue generated from these uses will be calculated, and a share of these profits will be claimed. This ensures that athletes receive compensation for past exploitation of their NILs. Plaintiffs seek retroactive compensation for historical use of their NILs.

l.      **Group Licensing Agreements**: Forming collective bargaining units to enter into group licensing agreements can aggregate the value of lesser-known student-athletes into a significant total sum, ensuring equitable distribution of profits. Historical records showing the success of group licensing agreements in other contexts will support this claim, highlighting the potential financial benefits from collective licensing. Plaintiffs seek compensation based on group licensing agreements.

m.      **Long-Tail Endorsements**: Capitalizing on smaller, localized endorsement deals ensures even lesser-known student-athletes are compensated for the missed opportunities within their reach. Market data showing typical earnings from local endorsements will be used to estimate potential earnings that could have been generated, emphasizing the financial potential from these often-overlooked opportunities. Plaintiffs seek compensation for lost long-tail endorsements.

n.      **Social Media Influencer Marketing**: Leveraging social media platforms for revenue was another avenue denied by NCAA restrictions. Social media metrics and potential earnings from sponsored posts will be projected to claim lost revenue, illustrating the modern revenue streams that athletes were prevented from accessing. Plaintiffs seek compensation for lost social media influencer marketing opportunities.

{02126348-1 }

o.  **Revenue Sharing from Media Rights**: Sharing revenue generated from broadcasting games and highlights is another potential revenue stream. Financial records from media rights deals will be examined to calculate the share of revenue attributable to the use of former student-athletes' performances, ensuring that athletes receive a fair share of the profits generated from their contributions. Plaintiffs seek a share of the revenue from media rights.

p.  **Intellectual Property Claims**: Treating the unauthorized use of NIL as intellectual property violations provides a strong legal foundation for claiming significant statutory damages. Instances of NIL use without authorization will be documented, and statutory damages for each infringement will be sought, emphasizing the legal basis for compensating student-athletes for unauthorized use of their identities. Plaintiffs seek statutory damages for intellectual property violations.

q.  **Appearance Fees and Personal Appearances**: Earnings from personal appearances at events were another tangible revenue stream denied due to NCAA policies. Records of missed opportunities for personal appearances and market rates for such events will be documented to calculate potential earnings, highlighting the financial impact of denied personal appearance opportunities. Plaintiffs seek compensation for lost appearance fees and personal appearances.

r.  **Health and Wellness Programs**: Promoting health and wellness programs leverages student-athletes' influence in health sectors to claim compensation for missed opportunities. Market data showing typical earnings from health and wellness endorsements will be used to project potential earnings, illustrating the financial potential from partnerships with fitness and health brands. Plaintiffs seek compensation for missed opportunities in health and wellness programs.

s.  **Educational and Training Programs**: Running sports camps, coaching clinics, and other educational programs represent long-term career opportunities that were denied due to NCAA policies. Historical data on earnings from such programs will be used to

{02126348-1 }

calculate potential long-term earnings, demonstrating the extended financial impact of missed educational and training opportunities. Plaintiffs seek compensation for lost opportunities in educational and training programs.

t.    **Legal Costs and Fees**: Costs incurred in pursuing legal action against the NCAA, including attorney fees and court costs, should be recovered to ensure that Plaintiffs are not financially burdened by the pursuit of justice. Documenting all legal costs incurred and including these in the claims for damages will ensure full financial recovery for Michigan student-athletes, preventing additional financial strain from seeking rightful compensation. Plaintiffs seek recovery of all legal costs and fees incurred in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, through their attorneys, respectfully request that this Court:

1.    Certify this action as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

3.    Declare that Defendants' actions as described herein constitute violations of federal antitrust law and common law unjust enrichment;

4.    Award Plaintiffs and the Class damages in an amount to be determined at trial, including treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

5.    Award Plaintiffs and the Class restitution and/or disgorgement of all profits earned by Defendants through the use of their names, images, and likenesses;

6.    Award Plaintiffs and the Class an amount in excess of $50,000,000 plus their reasonable attorneys' fees, costs, and expenses incurred in this

{02126348-1 }

action;

7.    Award such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,
CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC


JAMES R. ACHO (P62175)
17436 College Parkway, 3rd Floor
Livonia, MI  48152
734-261-2400 / 248-261-4510 fax
Attorney for Plaintiffs
jacho@cmda-law.com

Dated:   September 9, 2024

{02126348-1 }