# Exhibit A

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV017715-910

| | |
|---|---|
| MEMBERS OF NORTH CAROLINA STATE UNIVERSITY'S 1983 NCAA MEN'S BASKETBALL NATIONAL CHAMPIONSHIP TEAM, aka THE "CARDIAC PACK," including THURL BAILEY; ALVIN HARRELL BATTLE; WALT DENSMORE; TOMMY DINARDO; TERRENCE PATRICK GANNON; MARTHA LOU MOBLEY, as Administrator of the Estate of QUINTON LEONARD III; GEORGE CALVIN MCCLAIN; COZELL MCQUEEN; ERNIE MYERS; WALTER PROCTOR; HAROLD LEWIS THOMPSON; and MIKE WARREN, <br><br>                    Plaintiffs, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION aka NCAA, <br>                    Defendant. | **ORDER AND OPINION ON DEFENDANT'S MOTION TO DISMISS** |

**THIS MATTER** is before the Court on Defendant National Collegiate Athletic Association's ("NCAA") Motion to Dismiss ("Motion to Dismiss," ECF No. 50).

**THE COURT**, having considered the Motion to Dismiss, the briefs of the parties, the arguments of counsel, and all appropriate matters of record, **CONCLUDES** that the Motion to Dismiss should be **GRANTED** for the reasons set forth below.

*Cheshire Parker Schneider, PLLC, by Elliot Sol Abrams; Miller Law Group, PLLC, by W. Stacy Miller and MaryAnne M. Hamilton; and The Law Offices of Richard Noel Gusler, by Richard Noel Gusler, for Plaintiffs.*

*Bell, Davis & Pitt, P.A., by Alan M. Ruley and Lucy Hattenhauer; and Wilkinson Stekloff LLP, by Matthew Skanchy, Rakesh Kilaru, Calanthe Arat, and Tamarra Matthews Johnson, for Defendant.*

Davis, Judge.

## INTRODUCTION

1.     In this lawsuit, twelve former members of North Carolina State University's ("N.C. State") 1983 NCAA men's basketball championship team have sued the NCAA for using—without permission—their names, images, and likenesses contained in copyrighted game footage from that season.  Because their claims are untimely, barred by their failure to allege a violation of a legally enforceable right, and preempted by the federal Copyright Act, dismissal of this action in its entirety is appropriate.

## FACTUAL AND PROCEDURAL BACKGROUND

2.     The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to, referred to, or incorporated by reference in the complaint) that are relevant to the Court's determination of the motion.  *See, e.g.*, *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *4, *11 (N.C. Super. Ct. July 12, 2017).

3.     As noted above, the plaintiffs in this case are twelve former members of the 1983 N.C. State men's basketball team: Thurl Bailey, Alvin Harrell Battle, Walt

Densmore, Tommy DiNardo, Terrence Patrick Gannon, Quinton Leonard III,[1] George Calvin McClain, Cozell McQueen, Ernie Myers, Walter Proctor, Harold Lewis Thompson, and Mike Warren (collectively, "Plaintiffs").  (First Am. Compl. ("FAC"), ECF No. 41, ¶¶ 20–32.)

4.     The NCAA is an unincorporated association of over 1,100 member schools, conferences, and organizations throughout the United States and Canada. (FAC ¶ 33.)  It "oversees more than half a million student-athletes across its three competitive divisions" and "sponsors more than 90 national championships in 24 sports." (FAC ¶ 52.)  The NCAA's headquarters are located in Indianapolis, Indiana, and several of its member schools are located in North Carolina.  (FAC ¶¶ 33–34.)

5.     In the early 1980s, Plaintiffs attended N.C. State, which is located in Raleigh, North Carolina.  (FAC ¶ 19.)  N.C. State is a member of the NCAA and is classified by the organization as a "Division I" institution.  (*See* FAC ¶ 18.)

6.     While attending N.C. State, Plaintiffs all played on the men's basketball team, which is known as the "Wolfpack."  (FAC ¶¶ 18, 113.)

7.     As an institutional member of the NCAA, N.C. State's athletic teams are governed by the NCAA's policies and regulations.  (*See* FAC ¶ 50.)  According to the NCAA, these policies and regulations are intended to promote the "amateurism" of student-athletes, while also protecting them "from exploitation by professional and commercial enterprises."  (FAC ¶¶ 51, 55.)

---

[1] Plaintiff Martha Lou Mobley brings this lawsuit on behalf of Leonard's estate as its duly appointed Administrator.  (FAC ¶ 26.)

8.     Before joining the Wolfpack, Plaintiffs were required by NCAA bylaws to sign a form called the "Student-Athlete Statement" ("SAS").  (FAC ¶¶ 63, 67.)  The SAS purportedly serves to verify "an athlete's eligibility for participation in NCAA sports."  (FAC ¶ 64.)

9.     Although the NCAA has apparently amended the terms of the SAS in recent years, the version of the form that Plaintiffs were required to sign included the following provision:

> You authorize the NCAA [or a third party acting on behalf of the NCAA] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

(FAC ¶ 66.)

10.    At all relevant times, it has been the NCAA's policy that any student-athletes who refuse to sign the SAS are automatically disqualified from participating in NCAA-sponsored programming.  (FAC ¶ 65.)  Moreover, because "NCAA Division I schools provide the only pathway to professional sports for most student-athletes[,] . . . a student-athlete who refuses to sign the [SAS] gives up not only his or her collegiate athletic career, but any prospect of continuing to the professional level."  (FAC ¶¶ 71–72.)

11.    Upon signing the SAS, eligible student-athletes who play basketball at select Division I schools (such as N.C. State) can potentially compete in "March Madness," an annual college basketball championship tournament.  (FAC ¶¶ 54, 93.)

12.    The television and marketing rights associated with March Madness are major sources of revenue for the NCAA.  (FAC ¶ 54.)

13.     In addition to live television coverage of March Madness, basketball fans can receive on-demand access to full-length rebroadcasts of game footage through at least two YouTube channels that are operated by the NCAA or its partner organizations.[2]   (FAC ¶¶ 77, 102–04.)   The NCAA also routinely licenses "stock footage or images for commercial or editorial use, replay[s] of 'classic' games on streaming and television outlets, posters and photographs, and other merchandise" in connection with its tournaments.   (FAC ¶ 74.)   Beyond that, on the NCAA's website—NCAA.com—"users may view game footage, including footage of the 1983 championship game, [but] only after watching an advertisement, from which the NCAA and its [media partners] earn revenues."[3]   (FAC ¶ 105.)

14.     Archival footage of March Madness represents "an ongoing income stream for the NCAA long after the students whose images are used have moved on from college."   (FAC ¶¶ 107–08.)

15.     In 1983, Plaintiffs helped lead N.C. State's Wolfpack to "an improbable championship victory" in that year's March Madness tournament, "[lighting] a fire under college basketball fans, drawing new viewers and building new loyalties."

---

[2] The NCAA's partners include Turner Sports Interactive ("TSI"), CBS Broadcasting Inc., CBS Sports Inc., and TNT Sports.   (FAC ¶ 15.)   Plaintiffs originally named these entities as additional defendants in their FAC.   However, Plaintiffs voluntarily dismissed all claims against them on 23 September 2024, leaving the NCAA as the sole remaining defendant in this lawsuit.   (ECF No. 45.)

[3] Plaintiffs allege that "the NCAA sells viewer information from its website and YouTube channels to third parties, who pay [the] NCAA for access to that data."   (ECF No. 109.)

(FAC ¶¶ 113, 147.)  Plaintiffs' success garnered national media attention and earned the Wolfpack the "Cardiac Pack" nickname.  (FAC ¶¶ 132–33.)

16.     In the decades that followed, media coverage generated by March Madness yielded "billions of dollars in revenue for the NCAA and its affiliates[.]" (FAC ¶ 152.)  Footage from the 1983 March Madness tournament—including footage of Plaintiffs' performances in that tournament—remains "continuously available on [the NCAA's] YouTube channels" and on the NCAA's website.  (FAC ¶¶ 104–05.)

17.     Plaintiffs, however, have not received any portion of the profits derived from the use of this footage for themselves.  (FAC ¶ 8.)

18.     On 10 June 2024, Plaintiffs initiated this lawsuit by filing a Complaint in Wake County Superior Court.   (ECF No. 3.)   That same day, this case was designated as a mandatory complex business case and assigned to the undersigned. (ECF Nos. 1, 2.)

19.     On 26 August 2024, Plaintiffs filed the FAC, which is currently their operative pleading.

20.     The FAC includes claims for unreasonable restraint of trade in violation of N.C.G.S. §§ 75-1 and 75-2; monopoly maintenance and monopoly leveraging in violation of N.C.G.S. § 75-2.1; unfair and deceptive trade practices ("UDTP") in violation of N.C.G.S. § 75-1.1; and claims brought under North Carolina common law for misappropriation of name, image, likeness, and publicity rights; invasion of privacy; and unjust enrichment.  (FAC ¶¶ 169–238.)

21.     On 1 July 2024, a few weeks after filing this lawsuit, several of the same attorneys representing Plaintiffs in the present action initiated a separate lawsuit against the NCAA and a number of its associated entities in the United States District Court for the Southern District of New York.  *See Chalmers v. NCAA*, 2025 U.S. Dist. LEXIS 79578 (S.D.N.Y. Apr. 28, 2025) ("*Chalmers*").

22.     The named plaintiffs in *Chalmers* were sixteen former Division I college basketball players who attended various NCAA member universities.  (*Chalmers* Am. Compl. ¶¶ 15–30, ECF No. 58.2.)  None of them were alumni of N.C. State.  (*Chalmers* Am. Compl. ¶¶ 15–30.)  *Chalmers* was also brought on behalf of a putative class of former collegiate athletes from around the country.  (*Chalmers* Am. Compl. ¶ 153.) The Amended Complaint in *Chalmers* defined that class as follows:

> All individual persons who were NCAA student-athletes prior to June 15, 2016, whose image, likeness, or footage has been used or licensed for commercial purposes by the NCAA, the Conferences, or Veritone; or their agents, distributors, contractors, licensees, subsidiaries, affiliates, or partners; or anyone acting in concert with any of the foregoing entities or persons.

(*Chalmers* Am. Compl. ¶ 153.)

23.     The substantive allegations in *Chalmers* were similar to those in the present case—namely, that the NCAA has violated antitrust laws, wrongfully failed to compensate former collegiate athletes for the use of their names, images, and likenesses over a number of decades, and forced those athletes to relinquish their rights of publicity.  (*See Chalmers* Am. Compl. ¶¶ 10, 56, 93.)  More specifically, the *Chalmers* plaintiffs asserted claims for unreasonable restraint of trade, group boycott, and refusal to deal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

7

monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; and unjust enrichment under federal common law. (*Chalmers* Am. Compl. ¶¶ 172–93.)

24.     To support those claims, the Amended Complaint in *Chalmers* included many allegations that overlapped with those contained in the FAC here— including, among others, assertions that the NCAA required student-athletes to sign the SAS forms and regarding the NCAA's alleged monopoly over the national collegiate athletics market. (*See, e.g.*, *Chalmers* Am. Compl. ¶¶ 120–28.)

25.     On 18 October 2024, the NCAA filed its Motion to Dismiss in the present action.  In addition, given the substantial degree of overlap between this lawsuit and *Chalmers*, the NCAA simultaneously filed a motion to stay all proceedings in this case pending a final judgment in *Chalmers*.  ("Motion to Stay," ECF No. 47.)

26.     This Court entered an order denying the NCAA's request for a stay on 25 March 2025.  *Members of N.C. State Univ.'s 1983 NCAA Men's Basketball Nat'l Championship Team v. NCAA*, 2025 NCBC LEXIS 32, at *19 (N.C. Super. Ct. Mar. 25, 2025).

27.     As discussed in more detail later in this Opinion, the Southern District of New York issued an order on 28 April 2025 dismissing the *Chalmers* lawsuit in its entirety.  *See Chalmers*, 2025 U.S. Dist. LEXIS 79578, at *52.

28.     On 1 May 2025, this Court held a hearing on the present Motion to Dismiss at which all parties were represented by counsel.

29.     The Motion to Dismiss has now been fully briefed and is ripe for resolution.

## LEGAL STANDARD

30.     In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory[,]" *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up).

31.     "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

32.     The Court concludes that dismissal of this action in its entirety is proper on a number of grounds, each of which is discussed in detail below.

## I.     Statute of Limitations

33.     Plaintiffs' statutory claims for unreasonable restraint of trade, monopoly maintenance, monopoly leveraging, and UDTP are subject to a four-year statute of limitations.  *See* N.C.G.S. § 75-16.2.  Plaintiffs' common law claims for

misappropriation of name, image, likeness, and publicity rights; invasion of privacy; and unjust enrichment are governed by a three-year limitations period. *See* N.C.G.S. §§ 1-52(1), (5).

34.   "[T]he period of the statute of limitations begins to run when *the plaintiff's right* to maintain an action *for the wrong alleged* accrues." *Raftery v. Wm. C. Vick Constr. Co.*, 291 N.C. 180, 184 (1976); *see also* N.C.G.S. § 1-15(a) ("Civil actions can only be commenced . . . after the cause of action has accrued[.]"). Conversely, "[i]n no event can a statute of limitations begin to run until a plaintiff is entitled to institute action." *Raftery*, 291 N.C. at 183.

35.   Plaintiffs' own allegations in the FAC make clear that the original allegedly unlawful act giving rise to their injuries was the NCAA's act of forcing them to sign the SAS prior to the beginning of the 1983 NCAA basketball season.  Indeed, this point is repeatedly emphasized in numerous locations throughout Plaintiffs' FAC.  The following examples are illustrative:

- Under NCAA Bylaw 14.1.3.1, student-athletes are required to sign a form titled "Student-Athlete Statement" each academic year before their athletic season begins.

- The form asks the student for information related to financial aid, amateur status, drug tests, involvement in gambling, and other issues that may affect an athlete's eligibility for participation in NCAA sports.

- The form is absolutely required.  According to the bylaws, "Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

- Although the provision has evidently been eliminated on recent versions of the form, older versions included a requirement that the student-athlete agree to the following statement:

> You authorize the NCAA [or third party acting on behalf of the NCAA] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

- On information and belief, the Student-Athlete Statements signed by Plaintiffs included this provision or one substantially similar to it.

- The NCAA has interpreted this simple statement, presented as part of a form student-athletes—most of them very young adults with little or no legal sophistication—are told they *must* complete if they want to play, **to confer a license in perpetuity** for the use of images and likenesses created during the athlete's collegiate career.

- Furthermore, the form is generally presented by a person the athlete recognizes [as] an authority figure, a coach or Athletic Director.

- In this way, the NCAA exploits its gross disparity in bargaining power to **coerce student-athletes to give up legal rights they may not even realize they have.**

- The NCAA controls virtually all collegiate sports, especially at the elite levels, and it controls access to scholarship funds for Division I student-athletes.  Further, NCAA Division I schools provide the only pathway to professional sports for most student-athletes.

- Thus, a student-athlete who refuses to sign the statement gives up not only his or her collegiate athletic career, but any prospect of continuing to the professional level.

- Further, because refusing to sign would also mean foregoing athletic scholarships, resisting NCAA rules would, for many student-athletes, also mean losing the opportunity for a college education.

. . .

- The NCAA's reliance on an assignment of student-athletes' publicity rights obtained coercively in violation of N.C. Gen. Stat. § 75-1, 75-2, and 75-2.1 constitutes an unfair and deceptive act or trade practice.

. . .

11

- The NCAA coerces student-athletes into signing away their publicity rights in a context that makes the contracts themselves unconscionable:

  - The waivers are part of a form students *must* sign if they want to play; no negotiation is allowed.

  - The waivers are presented by an authority figure, often a coach, making students less likely to protest.

  - The waivers take advantage of young adults' lack of legal sophistication; NCAA rules prohibit athletes from consulting agents or attorneys regarding the forms.

  - Young athletes just embarking on their careers can have no real idea what value their NIL rights may have.

- Having acquired student-athletes' publicity rights through coercion, the NCAA then simply assumes that the students' tender of their rights at the very beginning of their collegiate careers represents a perpetual conveyance.

(FAC ¶¶ 63–73, 215, 217–18 (emphasis in original).)

36.   Accordingly, because Plaintiffs' injuries as alleged in this lawsuit derive from an act taken during (or shortly before) the 1983 season, the statute of limitations applicable to each of their claims expired decades ago.

37.   Plaintiffs seek to avoid the effect of the statute of limitations by invoking the "continuing wrong" doctrine.  However, as explained below, that doctrine does not apply here.[4]

---

[4] The Court notes that Plaintiffs have neither pled in their FAC nor argued in response to the NCAA's Motion to Dismiss the applicability of the doctrines of equitable estoppel or equitable tolling as additional defenses to the statute of limitations.  Under our caselaw, their failure to do so precludes any consideration of those doctrines by the Court.  *See Friedland v. Gales*, 131 N.C. App. 802, 807 (1998) ("The party seeking to invoke the doctrine of equitable estoppel must plead facts sufficient to raise an issue as to its application."); *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) ("[A] litigant seeking equitable tolling bears the burden of establishing [the required] elements[.]").

38.    The continuing wrong doctrine—also known as the continuing violation doctrine—is often called an "exception" to the general rule that a cause of action accrues as soon as the plaintiff has the right to sue.  *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 86 (2011).  In reality, it merely provides that "the applicable limitations period starts anew in the event that an allegedly unlawful act is repeated."  *Quality Built Homes Inc. v. Town of Carthage*, 371 N.C. 60, 70 (2018) ("Although the 'continuing wrong' doctrine has been treated . . . as an 'exception' to the usual rules governing . . . statutes of limitations, such a description . . . is a misnomer given that [it] does nothing more than provide that the applicable limitations period starts anew in the event that an allegedly unlawful act is repeated.").

39.    Under North Carolina law, "[t]he continuing wrong doctrine is not easily invoked[,]" *Soft Line, S.p.A. v. Italian Homes, LLC*, 2015 NCBC LEXIS 6, at *13 (N.C. Super. Ct., Jan. 16, 2015), and our courts apply it narrowly, *Birtha v. Stonemore, N.C., LLC*, 220 N.C. App. 286, 292 (2012).

40.    In order for the continuing wrong doctrine to be triggered, a plaintiff must demonstrate that its injuries are the result of "continual unlawful acts," and not "continual ill effects from an original violation."  *Williams v. Blue Cross Blue Shield*, 357 N.C. 170, 179 (2003) (cleaned up).  Additionally, courts must consider "the particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged[,]" in deciding whether to apply the continuing wrong doctrine.  *Id.* (cleaned up).

13

41.    In response to the Motion to Dismiss, Plaintiffs contend that "[e]ach unauthorized use of [their] likenesses for commercial purposes constitutes another wrongful act by the NCAA" that restarts the applicable limitations periods on each of their claims.  (Mem. Opp'n Def.'s Mot. Dismiss, at 9, ECF No. 54.)  Accordingly, Plaintiffs argue, because the NCAA and its affiliates have continuously used videos and images of Plaintiffs' game footage from the 1983 season without their permission up to and including the present year, the continuing wrong doctrine renders their claims timely.  The Court disagrees.

42.    The *Chalmers* Court rejected a similar argument involving the federal continuing wrong doctrine, which is virtually identical to North Carolina's version of the doctrine.[5]  In its analysis, the *Chalmers* court stated the following:

> Principally, plaintiffs invoke the "continuing violation" doctrine.  They argue that although the conduct by the defendants that violated the antitrust laws—agreements with the student-athlete plaintiffs pursuant to that conspiracy that resulted in the student-athletes ceding ownership of their NIL rights—occurred long ago, each ensuing use by a defendant of a plaintiff's name, image or likeness is an outgrowth of the antitrust conspiracy and restarts the limitations period on the Sherman Act § 1 claims.  They argue that even though the ownership of their NILs was acquired more than four years before the filing of the Complaint, each use of a NIL constitutes a new antitrust injury.
>
> . . .
>
> Plaintiffs' theory, however, does not withstand the case law.  Under it, the NCAA's use today of a NIL acquired decades ago as the fruit of an antitrust violation does not constitute a new overt act restarting the limitations clock.  Instead, as the NCAA argues, the contemporary use

---

[5] It is well settled that North Carolina courts may consider federal case law as persuasive authority.  *See, e.g.*, *Sykes v. Health Network Sols., Inc.*, 2018 NCBC LEXIS 29, at *8 (N.C. Super. Ct. Apr. 5, 2018).

of a NIL reflects performance of an aged agreement: a contract between the student-athlete and the NCAA under which it acquired footage and images of the plaintiff.  Such a use is, in fact, a textbook example of the "performance of a contract" that is "a manifestation of the 'overt act,' [specifically] the decision to enter the contract, rather than an independent overt act of its own." *US Airways*, 938 F.3d at 69; *see SL-x IP S.a.r.l. v. Merrill Lynch Pierce, Fenner & Smith Inc.*, No. 21-2697-CV, 2023 U.S. App. LEXIS 7091, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023) (collecting cases). The use by the NCAA or a conference defendant of a plaintiff's NIL acquired in the 1990s or early 2000s is a continuing *effect*—a consequence—an outgrowth of the alleged anticompetitive conduct.  It is not a part of it.  *See, e.g.*, AC ¶¶ 17, 24-26, 30; *see also Simmons v. Reich*, No. 20-4114-CV, 2021 U.S. App. LEXIS 32372, 2021 WL 5023354, at *3 (2d Cir. Oct. 29, 2021) (limitations period does not restart when events are "derivative," or "direct consequences" of earlier wrongdoing).

. . .

In light of this body of case authority and the principles informing it, the AC's theory of a continuing violation fails.  The AC alleges that each of the 16 plaintiffs, during his college career, entered into an agreement to relinquish his NIL rights, with all such agreements occurring between 1994 and mid-2016, specifically, during the academic year, before the athletic season began.  *See* AC ¶ 153 (plaintiffs were "student-athletes prior to June 15, 2016"); *see also id.* ¶¶ 30, 149 (each named plaintiff played from 1994 to mid-2016); *id.* ¶ 120 (each named plaintiff relinquished his NIL rights each academic year).  The agreements authorized the NCAA to use student-athletes' NILs and prevented plaintiffs from using the same for their own "promotional activities." *Id.* ¶¶ 117, 123.  Plaintiffs' claims are not salvaged by defendants' alleged continued exploitation of the NIL rights acquired pursuant to these agreements.  That is because, under the caselaw above, the commercial usage of their NILs was merely a manifestation of these long-ago agreements, entered into while plaintiffs were in college. The AC does not allege that any agreement between a plaintiff and defendants to surrender plaintiff's NIL rights occurred within, or anywhere close to, the four-year period before the filing of this lawsuit. Their claims are thus time-barred.

*Chalmers*, 2025 U.S. Dist. LEXIS 79578, at *21–22, *27–28, *31–32.  *See also Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 136–37 (D. Conn.) ("Choh first felt the adverse impact of the Ivy League Agreement no later than when he enrolled at Brown

University in September 2017.  His claim accrued by then and the statute of limitations began running.  The failure of Brown to award him an athletic scholarship or compensation for athletic services during the remainder of his time at Brown was simply a manifestation of the overt act, namely Brown's decision to enter into the most recent version of the Ivy League Agreement.  That version of the Ivy League Agreement was simply a vehicle for determining at the time of contracting what should happen at some time thereafter, namely at the time when Choh enrolled at Brown University."  (cleaned up)).

43.     Indeed, within the past few weeks, another federal court has used a similar analysis in rejecting on statute of limitations grounds analogous antitrust claims brought by a former student-athlete in a suit against the NCAA.  *See Pryor v. NCAA*, 2025 U.S. Dist. LEXIS 137504, at *15–17 (S.D. Ohio July 18, 2025).  In *Pryor*, the United States District Court for the Southern District of Ohio stated, in relevant part, as follows:

> Here, Mr. Pryor alleges that "**at the time the Plaintiff and the class played college sports**, the Defendants required them not only to cede control of their publicity rights to them in perpetuity, but also to police the use of their names, images, and likenesses by other parties or else forfeit their right to compete." (Compl., PAGEID # 4 (emphasis added).)  As a result of Defendants' challenged conduct, Mr. Pryor claims he has "been deprived, and continue[s] to be deprived, of the compensation [he] would receive in an open market" while Defendants "have made millions, if not billions, of dollars." (*Id.*, PAGEID # 5.)
>
> Mr. Pryor was a student-athlete at OSU from 2008 to 2010.  Thus, Defendants' alleged act that caused his injury—requiring him to give them control over his publicity rights—occurred at the latest in 2010.  And while Mr. Pryor alleges that he continues to feel the adverse impacts of Defendants' act, "the fact that [his] injuries have a rippling effect into the future only establishes that [he] might have been entitled

16

to future damages if [he] had brought suit within four years of the commission of the last antitrust violation." *Peck*, 894 F.2d at 849.

Mr. Pryor argues that the statute of limitations for his claims is restarted each time Defendants use footage or images of his performances for commercial purposes because "but for [Defendants'] price fixing agreement, he would have received royalties or other compensation[.]" (ECF No. 50 ("Pl.'s Resp. Conf. Defs.' MTD"), PAGEID # 608.) But the continued commercial usage of Mr. Pryor's NIL rights is a "manifestation" of Defendants' past conduct, not a new and independent act that restarts the statute of limitations. *See Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999); *see also Chalmers*, 2025 WL 1225168, at *10. Indeed, if the Court were to adopt Mr. Pryor's theory, "the applicable limitations period for a § 1 claim would be infinite—an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009).

Mr. Pryor also contends that Defendants' conduct constituted a continuing violation because he did not freely choose to enter a contract, arguing that Defendants' "horizontal price-fixing agreement provided him with no choice but to accept the restrictions on use of his NIL[.]" (Pl.'s Resp. Conf. Defs.' MTD, PAGEID # 609.) But he provides no authority that suggests the validity of the contract is part of the continuing violations analysis in the context of alleged anticompetitive contracts.

Defendants' alleged post-agreement conduct did not constitute a new overt act. Accordingly, the continuing violations doctrine does not apply to Mr. Pryor's Sherman Act claims.

*Id.*

44. Moreover, in addition to finding that the plaintiffs' antitrust claims were time-barred, both the *Chalmers* and *Pryor* courts also rejected the applicability of the continuing wrong doctrine to the plaintiffs' unjust enrichment theory. *See Pryor*, 2025 U.S. Dist. LEXIS 137504, at *22 ("Mr. Pryor argues his unjust enrichment claim is timely for the same reasons as his antitrust claims. But, as discussed above, he gave Defendants the benefit (control over his NIL) over a decade ago. The 'continual

17

ill effects' resulted from this original alleged violation, not from Defendants' later conduct. Accordingly, his unjust enrichment claim is time-barred."); *Chalmers*, 2025 U.S. Dist. LEXIS 79578, at *50–51 ("As pled, defendants' allegedly inequitable conduct in wrestling from the 16 plaintiffs the rights to their NILs occurred a decade (or much more) ago. Plaintiffs have not made any argument why defendants' commercial use of the NILs many years later is separately actionable as unjust enrichment.")

45.     The Court finds that the analyses employed by the courts in both *Chalmers* and *Pryor* are wholly consistent with the interpretation of the continuing wrong doctrine under North Carolina law by the courts of this State.

46.     For example, in *Stratton v. Royal Bank of Canada*, the plaintiff (who was an heir to her mother's estate) sued a bank several years after discovering that her deceased mother held a stock interest in the predecessor to one of the bank's affiliated companies. *Stratton*, 211 N.C. App. at 78. The plaintiff claimed, among other things, that the bank had wrongfully converted the stock to which she was the rightful owner. *Id.* at 82. In affirming the trial court's order finding that the plaintiff's claims were barred by the statute of limitations, the Court of Appeals rejected the plaintiff's attempt to invoke the continuing wrong doctrine regarding her claim for conversion of the stock interest. *Id.* at 87. The plaintiff argued that the doctrine applied "because [the defendant] ha[d] continually deprived her of [her] shareholder rights, including her right to stock and cash dividends." *Id.* at 86. In holding that the claim was time-barred, the Court of Appeals ruled that

[t]he conversion of Ms. Stratton's stock was a discrete occurrence—not a cumulative one—that should have been discovered through reasonable diligence. That the precise moment of conversion may be difficult to discover does not change our calculus. And even though Ms. Inge may not have been on immediate notice of the conversion, this does not justify remaining idle for several decades. At some point shortly after the stock conversion, it should have become obvious to Ms. Inge she was no longer a shareholder. Applying the continuing wrong doctrine under these facts would discourage shareholders from promptly investigating and litigating stock conversion claims, thereby defeating the policy objectives advanced by statutes of limitations.

*Id.* at 87.

47.     The Court of Appeals' decision in *Knudson v. Lenovo (United States) Inc.*, 2023 N.C. App. LEXIS 649 (2023) (unpublished) is also instructive. In *Knudson*, a plaintiff sued his prior employer for failing to pay him in exchange for his contributions to the employer's internal patent development program during his employment. *Id.* at *2. Among the plaintiff's claims was a cause of action for UDTP. *Id.* The Court of Appeals held that the continuing wrong doctrine did not rescue the UDTP claim because "all of Plaintiff's arguments concerning th[e] allegedly continuing wrong relate[d] to Lenovo's continuation through the patent filing process with respect to rights already assigned to it during or before 2017." *Id.* at *31.

48.     The same logic applies equally in the present action. Unlike in some cases where it is difficult to identify one specific wrongful act from which future damages flowed, that is not the case here. Instead, as the above-quoted examples from the FAC demonstrate, Plaintiffs (as was likewise true in *Chalmers* and *Pryor*) have alleged that they possessed NIL rights that the NCAA required them to relinquish prior to being allowed to participate in their collegiate athletic events.

19

Accordingly, by Plaintiffs' own allegations, *that* relinquishment—through the signing of the SAS—was the discrete act forming the basis for any injuries they proceeded to suffer over the coming decades.

49.     Finally, as previously discussed, North Carolina courts generally examine the purpose of the underlying statute of limitations in determining whether to apply the continuing wrong doctrine.  Our Supreme Court has stated that "equity will not afford relief to those who sleep upon their rights, or whose condition is traceable to that want of diligence which may fairly be expected from a reasonable and prudent man." *Pearce v. N.C. State Highway Patrol Volunteer Pledge Comm.*, 310 N.C. 445, 451 (1984) (cleaned up).  "A hard truth in civil litigation is that those who sleep on their rights lose them.  Statutes of limitations are inflexible and unyielding, commanding that litigation be initiated within the prescribed time or not at all." *McFee v. Presley*, 2023 NCBC LEXIS 173, at *8 (N.C. Super. Ct. Dec. 28, 2023) (cleaned up).

50.     Plaintiffs signed the SAS forms over 40 years ago.  They could have brought a legal challenge to the forced relinquishment of their NIL rights decades ago, and they have offered no valid legal basis for this Court to excuse their inaction.

51.     Furthermore, to the extent Plaintiffs are contending that courts did not recognize NIL-related claims by former collegiate athletes against the NCAA until recently, that argument is unavailing as well.  As the *Pryor* court noted, these types of lawsuits have existed since 2009. *See Pryor*, 2025 U.S. Dist. LEXIS 137504, at *18–19 ("Mr. Pryor argues 'the true nature' of Defendants' conduct was not knowable

until the United States Supreme Court's decision in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), upholding an injunction against the NCAA's limits on education-related benefits that violated the antitrust laws.   But other student-athletes have brought lawsuits against the NCAA about substantively the same practices that Mr. Pryor now challenges dating to 2009—and he does not claim to have been unaware of those earlier litigations.   His choice to not bring this action until *Alston* was decided does not excuse his delay." (cleaned up)); *see also Chalmers*, 2025 U.S. Dist. LEXIS 79578, at *39 ("[A]lthough plaintiffs in antitrust suits that significantly paralleled this one (and indeed included plaintiffs common to this action) brought claims against the NCAA years ago, the plaintiffs here sat on their hands for more than a decade before bringing this lawsuit.   And plaintiffs' attempt to rationalize this lawsuit as being unavailable to them until *Alston* was decided is unpersuasive, for multiple reasons.   The pendency of *Alston* did not prevent other litigants, like those in *House*, from earlier pursuing (and obtaining a settlement of) similar such claims.   And even after *Alston* was decided, in 2021, *see* 594 U.S. at 73, plaintiffs here waited approximately another three years to bring this action." (cleaned up)).

52.    For all of these reasons, this action is barred in its entirety by the statute of limitations.

## II.    Remaining Grounds for Dismissal

53.    For the reasons set about above, the statute of limitations—by itself—supports dismissal of Plaintiffs' FAC in its entirety.   However, because other

arguments asserted by the NCAA likewise mandate the dismissal of this action, the Court will address each of these additional grounds as well.

## A. Absence of a Legally Enforceable Right

54. At the outset, it is important to make clear what Plaintiffs are—and are not—alleging in this case.

55. Plaintiffs' sole basis for this lawsuit is the fact that they have not been compensated for the NCAA's repeated use of their NIL in *game footage* from the 1983 March Madness tournament over the past 41 years. Indeed, Plaintiffs' counsel confirmed this during the 1 May hearing:

> THE COURT: So[,] the complaint is a little vague as to what form the likenesses of the individual plaintiffs are being viewed, whether broadcast, rebroadcast, game footage, highlights, clips. Can you be a little more specific . . . about what it is you are actually alleging?
>
> [PLAINTIFFS' COUNSEL]: Yes, Your Honor. So[,] there are two categories of uses. All of the use is either clips or full broadcasts. I think there's a different analysis based on the use, but to answer your specific question, *the uses in question all involve replay of either clips or full game footage.*
>
> THE COURT: By clips, the clips are of game footage?
>
> [PLAINTIFFS' COUNSEL]: That's correct. And post[-]game, but it's all recorded during the event.

(Hr'g Tr., at 7.) (emphasis added)

56. Plaintiffs' claimed entitlement to compensation from the NCAA for its use of the game footage at issue stems from their argument that they possess a "right of publicity" under North Carolina law that allows them—by virtue of their

appearances in the underlying events—to control the production, reproduction, dissemination, and monetization of the footage.

57.     It is this right that Plaintiffs assert has been denied—causing them to suffer injury for purposes of both the antitrust statutes referenced in the FAC and under North Carolina's common law.[6]

58.     Plaintiffs' assertion that they possess a right of publicity in the use of their likenesses in game footage from the 1983 March Madness games is largely based on our Supreme Court's decision in *Flake v. Greensboro News Co.*, 212 N.C. 780 (1938).

59.     In *Flake*, the plaintiff sued the owner of a newspaper for mistakenly publishing her photograph in connection with an unrelated advertisement for a bread company.  *Id.* at 788.  The plaintiff alleged that the use of her photo in connection with the advertisement was libelous—either inferentially or *per se*—because it falsely suggested, among other things, that "she [was] a member of Folies de Paree," which was "a kind of burlesque or musical comedy[.]"  *Id.* at 788–89 (cleaned up).  According to the plaintiff, "the publication[,] when considered in connection with other facts and circumstances[,] could [have] reasonably be[en] construed as a libelous article."  *Id.* at 789.  In addition to asserting a claim for libel, the plaintiff also alleged that the publication of the photograph constituted a violation of her "right of privacy."  *Id.* at 785.

---

[6] More specifically, Plaintiffs' common law claim is titled in the FAC as a claim for "Misappropriation of Name, Image, and Likeness, and Publicity Rights; Invasion of Privacy (Violation of Common Law; Damages)."  (FAC, at 44.)

23

60.     In finding that the plaintiff enjoyed a general right of privacy, the Supreme Court opined that "the unauthorized use of one's photograph in connection with an advertisement or other commercial enterprise gives rise to a cause of action which would entitle the plaintiff, without the allegation and proof of special damages, to a judgment for nominal damages, and to injunctive relief[.]"  *Id.* at 792.

61.     The Supreme Court explained its ruling as follows:

> Instantaneous photography is a modern invention, and affords the means of securing a portraiture of an individual's face and form *in invitum* their owner.  While, so far forth as it merely does that, although a species of aggression, I concede it to be an irremediable and irrepressible feature of the social evolution.  But if it is to be permitted that the portraiture may be put to commercial or other use for gain by the publication of prints therefrom, then an act of invasion of the individual's privacy results, possibly more formidable and more painful in its consequences than an actual bodily assault might be. Security of person is as necessary as the security of property; and for that complete personal security which will result in the peaceful and wholesome enjoyment of one's privileges as a member of society there should be afforded protection, not only against the scandalous portraiture and display of one's features and person, but against the display and use thereof for another's commercial purposes or gain.  The proposition is, to me, an inconceivable one that these defendants may, unauthorizedly, use the likeness of this young woman upon their advertisement as a method of attracting widespread public attention to their wares; and that she must submit to the mortifying notoriety, without the right to invoke the exercise of the preventive power of a court of equity. . . .

> I think that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions.  The right would be conceded if she had sat for her photograph; but if her face or her portraiture has a value, the value is hers exclusively, until the use be granted away to the public.  Any other principle of decision, in my opinion, is as repugnant to equity as it is shocking to reason. . . .

> It would be, in my opinion, an extraordinary view, which, while conceding the right of a person to be protected against the unauthorized

> circulation of an unpublished lecture, letter, drawing, or other ideal property, yet would deny the same protection to a person whose portrait was unauthorizedly obtained and made use of for commercial purposes. . . . Whether, as incidental to that equitable relief, she would be able to recover only nominal damages, is not material, for the issuance of the injunction does not, in such a case, depend upon the amount of the damages in dollars and cents.

*Flake*, 212 N.C. at 791–92 (cleaned up).

62.     Plaintiffs also point to our Supreme Court's decision regarding tort liability arising from invasions of one's right to privacy in *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312 (1984).

63.     In *Renwick*, the plaintiff—a college dean—sued two newspapers for invasion of privacy following the publication of an allegedly defamatory editorial in their respective newspapers.  *Id.* at 315.  On appeal, our Supreme Court faced the question of "whether publicity by a defendant which places a plaintiff in a false light before the public gives rise to a claim for which relief can be granted upon a theory of invasion of privacy." *Id.* at 322.

64.     In its opinion, the Supreme Court recognized that "an invasion of privacy by the appropriation of a plaintiff's photographic likeness for the defendant's advantage as a part of an advertisement constitutes a tort giving rise to a claim for relief recognizable at law." *Id.* at 322.  Nevertheless, the Supreme Court declined to expand the tort of invasion of privacy to the facts of that case.  *Id.*  In so deciding, the Court stated, in relevant part:

> This Court was first called upon to consider a claim for invasion of privacy in *Flake v. Greensboro News Co.*, 212 N.C. 780, 195 S.E. 55 (1938).  In that case we were concerned, as were the courts of all jurisdictions when considering the early cases, primarily "with the

question whether the right of privacy existed at all, and gave little or no consideration to what it would amount to if it did." W. Prosser, Handbook of the Law of Torts § 117 at 804 (4th Ed. 1971).

In *Flake* we held that a right of privacy existed and for the first time held that an invasion of privacy by the appropriation of a plaintiff's photographic likeness for the defendant's advantage as a part of an advertisement constitutes a tort giving rise to a claim for relief recognizable at law. Although *Flake* involved overtones of "false light" publicity, we neither reached nor decided the precise question presented by the plaintiff here -- whether publicity by a defendant which places a plaintiff in a false light before the public gives rise to a claim for which relief can be granted upon a theory of invasion of privacy. We now hold that such facts do not give rise to a claim for relief for invasion of privacy. A plaintiff must recover in such situations, if at all, in an action for libel or slander.

*Id.*

65. Neither Plaintiffs' brief nor the Court's own independent research has disclosed any subsequent caselaw suggesting that our Supreme Court would extend the rights discussed in *Flake* or *Renwick* to encompass a collegiate athlete's right to recovery of monetary damages from the use of game footage from the broadcast of a sporting event in which he or she voluntarily participated.

66. Indeed, at the 1 May hearing, Plaintiffs' counsel largely conceded that, by participating in a sporting event, athletes implicitly consent to the use of their likenesses in the form of game footage.

THE COURT: So[,] is your argument that if the plaintiffs had not signed the SAS form at the beginning of that season, the NCAA could not lawfully have broadcast or licensed the broadcast rights for that year[']s national championship game, the Final Four?

[PLAINTIFF'S COUNSEL]: I don't think that the [SAS] form is needed in the usual circumstance for the broadcast itself. The reason is because the players are collaborating in the game knowing it's being broadcast. So[,] they consent by participating.

26

(*See* Hr'g Tr., at 42.)

67.     Plaintiffs' counsel likewise conceded that they have been unable to identify any North Carolina case law giving athletes the right to challenge the use of their images in game footage from a broadcasted sporting event.

> THE COURT: But are there any cases under North Carolina law that you saw will - - I want to ask you first expressly and then impliedly.  Any of those that expressly would give litigants the right to challenge the use of their images in a sports broadcast?
>
> [PLAINTIFFS' COUNSEL]:  I haven't found that, Your Honor.

(Hr'g Tr., at 80.)

68.     This view is consistent with decisions from federal courts that have rejected the notion that participants in an athletic contest possess a right of publicity in broadcasts (or rebroadcasts) of the event.  *See, e.g., Marshall v. ESPN Inc.*, 111 F. Supp. 3d 815, 825 (M.D. Tenn. 2015) ("Plaintiffs cite no Tennessee authority for the proposition that participants in sporting events have a right to publicity under the common law.  This is unsurprising since it appears virtually all courts in jurisdictions that have decided the matter under their respective laws have held to the contrary for a variety of reasons." (cleaned up)), *aff'd*, 668 F. Appx. 155, 157 (6th Cir. 2016).

69.     For these same reasons, Plaintiffs have also failed to allege a legally enforceable right for purposes of their antitrust claims.  *See Sitelink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45, at *20 (N.C. Super. Ct. June 14, 2016) ("To prevail on a claim that is based on 'antitrust injury,' [a plaintiff] must allege injury not only to [competition] but to [itself]." (cleaned up)).

70.     In *Marshall*, a putative class of current and former student-athletes sued the NCAA for violating federal antitrust laws by monopolizing a "broadcasting marketplace" through a series of "multi-million dollar broadcast contract[s] and multi-media agreements that purport[ed] to transfer the right to use the [athletes'] names and likeness[es.]"  *Marshall*, 111 F. Supp. 3d at 834 (cleaned up).

71.     However, the federal district court determined that because the athletes "d[id] not have . . . right[s] to publicity in sports broadcasts" to begin with, they could not successfully plead any antitrust injury.  *Id.* at 835.  In reaching this conclusion, the court reasoned that the athletes "[could not] have been injured by a purported conspiracy to deny them the ability to sell non-existent rights."  *Id.*

72.     In affirming the district court's decision, the Sixth Circuit reiterated— somewhat emphatically—that the notion that college athletes possess "right[s] of publicity in their names and images as they might appear in television broadcasts of football or basketball games in which [they] participate" is "a legal fantasy[,]" and that "those putative rights do not exist."  *Marshall*, 668 F. Appx. at 157.

73.     Here, as in *Marshall*, Plaintiffs cannot properly assert antitrust claims that are premised on the NCAA allegedly employing monopolistic conduct (or conduct in restraint of trade) to deprive them of legal rights that they do not actually possess. *See Edwards v. Town of Louisburg*, 290 N.C. App. 136, 141 (2023) ("Plaintiffs fail to show . . . a legally protected interest invaded by defendants' conduct." (cleaned up)); *Sitelink Software*, 2016 NCBC LEXIS 45, at *32 ("When a section 75-1.1 claim

derives solely from an antitrust claim, the failure of the antitrust claim also defeats liability under section 75-1.1.").

74.    The invalidity of these claims likewise requires dismissal of Plaintiffs' unjust enrichment claim, which is similarly based on the notion that the NCAA has wrongfully deprived Plaintiffs of revenue from its use of the game footage at issue. *See Chalmers*, 2025 U.S. Dist. LEXIS 79578 at *50 n.10 ("To the extent the unjust enrichment claims have been found derivative of a plaintiff's other claims, courts have declined to permit litigants to repackage their failed antitrust claims as unjust enrichment actions because it would thereby render the antitrust laws superfluous." (cleaned up)); *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462–63 (6th Cir. 2001) (affirming trial court's dismissal of unjust enrichment claim where that claim was "duplicative or derivative of [plaintiffs'] right of publicity claims"); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) ("The Court is persuaded that . . . all litigants who lack antitrust standing [should be barred] from bringing identical claims under a common law theory of unjust enrichment.  Certainly, if such plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate.  Practically, if economic harm caused by market manipulation was cognizable on a theory of unjust enrichment, the antitrust laws themselves would be superfluous.  Therefore, because they lack antitrust standing on their Sherman and Donnelly Act claims, plaintiffs cannot advance identical claims under a theory of unjust enrichment."); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257

(S.D.N.Y. 1995) (dismissing unjust enrichment claim predicated on allegations of "illegal, anticompetitive conduct" where underlying allegations ultimately failed to support claims under the Sherman and Donnelly Acts).

## B. Preemption by the Copyright Act

75.    Even if Plaintiffs possessed a legally enforceable right of publicity in the game footage at issue (which—for the reasons set out above—they do not), any claims under North Carolina law premised on such a right would be preempted by the federal Copyright Act of 1976 (the "Copyright Act").  *See* 17 U.S.C. § 301.

76.    The United States Supreme Court has recognized that a "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

77.    As a federal circuit court has observed,

[t]he Copyright Act of 1976 is one such instance where Congress has embraced this constitutional power.  In passing the Copyright Act, Congress sought to create a "national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989).  The purpose of the Copyright Act was "essentially to ensure a nationwide, uniform federal copyright system, [by] ousting the states from imposing any control of the area." *Jackson*, 972 F.3d at 42.

*Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 300 (2d Cir. 2022).

78.    Section 301 of the Copyright Act—which is titled "Preemption with respect to other laws"—reads, in relevant part, as follows:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [17 USCS § 106] in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and

103 [17 USCS §§ 102 and 103], whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301.

79.    "Accordingly, the Copyright Act preempts state law claims asserting rights equivalent to those protected within the general scope of the statute." *Melendez*, 50 F. 4th at 300 (cleaned up).

80.    Courts generally employ a two-pronged analysis to determine whether Section 301 of the Copyright Act preempts a particular state law claim.  *See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012).

81.    The first prong examines "the work that would be affected by the plaintiff's exercise of a state-created right and requires (as an essential element of preemption) that the work come within the subject matter of copyright as specified by sections 102 and 103" of the Copyright Act.  *Jackson v. Roberts*, 972 F.3d 25, 42 (2d Cir. 2020) (cleaned up).  The Court will refer to this prong as the "Subject Matter Prong."

82.    The second prong examines "the right being asserted (over a work that comes within the 'subject matter of copyright') and requires . . . that the right be *equivalent* to any of the exclusive rights within the *general scope* of copyright as specified by section 106" of the Copyright Act.  *Id.* at 43 (cleaned up).  The Court will refer to this prong as the "Equivalence Prong."

31

83. The Court must therefore analyze both prongs of the preemption test with respect to Plaintiffs' claims.

### i. Subject Matter Prong

84. Sections 102 and 103 of the Copyright Act list the specific types of works that are eligible for copyright protection. *See* 17 U.S.C. §§ 102, 103.

85. Section 102 states, in relevant part:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

17 U.S.C. §§ 102(a)(1)–(8).

86. Section 103 of the Copyright Act states:

(a) The subject matter of copyright as specified by section 102 [17 U.S.C.S. § 102] includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

32

> (b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. §§ 103(a)–(b).

87.     Accordingly, whether Plaintiffs' claims satisfy the Subject Matter Prong of the preemption analysis turns, in part, upon whether the subject matter at issue in Plaintiffs' claims qualifies as "works of authorship" falling within one of the categories of materials eligible for copyright protection under the Copyright Act.

88.     Here, Plaintiffs do not seriously dispute the fact that the NCAA owns a copyright to a tangible collection of game footage from the 1983 March Madness tournament, which includes the original broadcasts of the tournament's games along with rebroadcasts, highlights, or "clips" of game footage from the original broadcasts. Moreover, Plaintiffs do not contend that the NCAA has ever granted them a license— or assigned them the rights—to use this footage.

89.     It is also undisputed that the above-referenced game footage constitutes copyrightable material under Sections 102 and 103 of the Copyright Act.  *See Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*, 933 F.3d 1136, 1153 (9th Cir. 2019) ("[T]he telecasts of sporting events are plainly copyrightable 'motion pictures' under the Copyright Act of 1976."); *see also NBA v. Motorola, Inc.*, 105 F.3d 841, 847 (2d Cir. 1997) ("[R]ecorded broadcasts of NBA games -- as opposed to the games themselves -- are now entitled to copyright protection.  The Copyright

Act was amended in 1976 specifically to [e]nsure that simultaneously-recorded transmissions of live performances and sporting events would meet the Act's requirement that the original work of authorship be fixed in any tangible medium of expression." (cleaned up)).

90.    The owner of a copyright is guaranteed certain "exclusive rights" with respect to the copyrighted work.  *See* 17 U.S.C. § 106.  These include rights

> (1) to reproduce the copyrighted work in copies or phonorecords;

> (2) to prepare derivative works based upon the copyrighted work;

> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106 (cleaned up).

91.    The Copyright Act's "broad preemptive scope serves to [e]nsure that the enforcement of these rights remains solely within the federal domain[,]" *Tire Eng'g & Distrib., LLC*, 682 F.3d at 309 (cleaned up), and "to protect against suit one who is *lawfully* reproducing or publishing a copyright-protected work[,]" *Jackson*, 972 F.3d at 42.

92.     To these ends, the Copyright Act will preempt a plaintiff's state-law claims unless the plaintiff can demonstrate that the defendant manipulated or imitated the plaintiff's identity or likeness or otherwise used the plaintiff's identity or likeness to support a product *independent* from the copyrighted work.  *See Melendez*, 50 F.4th at 304 ("The amended complaint contains no allegations that [plaintiff's] name or likeness was extracted in any way to appear independently from how it originally appeared in the archival episodes, or that the excerpts were manipulated in some manner to bring his identity into focus.  Melendez's allegations, therefore, are directed at the copyrighted works in which he appears—the archival episode recordings—and not toward any separate use of his name or likeness."); *Jackson*, 972 F.3d at 47 ("[W]hen a defendant exhibits an image or representation of the plaintiff embodied in a copyrighted work in a manner that appears to communicate a message that the plaintiff endorses the defendant's service or product (other than the copyrighted work in which the plaintiff appears), courts have generally found that such a claim is not preempted.").

93.     In other words, to avoid triggering the preemptive effect of the Copyright Act, a plaintiff's state-law claims must focus not on the defendant's unauthorized use of a copyrighted work itself but instead should allege the unauthorized use of an independent subject matter—such as the plaintiff's identity or personal attributes—even if that independent subject matter is embodied in a copyrighted medium.

94.     Federal circuit courts have offered further illustration regarding the applicability of this distinction.

95.     In *Jackson*, the plaintiff—a recording artist—sued another artist for violating the plaintiff's common law right of publicity under Connecticut law by referencing his stage name and including a sample of his voice in the defendant's mix-tape. *Id.* at 30.  In finding that the plaintiff's right of publicity claim was preempted by the Copyright Act, the Second Circuit observed that

> the question whether the focus of Jackson's claim is the recognizable sound of his voice (which is not within the subject matter of copyright) or the copyrighted work in which that voice is embodied (which, of course, is within the subject matter of copyright) would depend on the gravamen of the claim and the allegations supporting it.  The "crux of the issue," the Ninth Circuit explained in *Maloney*, is whether "[the] claim seeks to vindicate misuse of an individual's likeness, as opposed to merely interfering with the distribution, display, or performance of a . . . work."  853 F.3d at 1012–13.  In general, when a defendant uses material within the subject matter of copyright depicting a plaintiff's likeness in a manner that falsely "suggest[s] that the [plaintiff] had endorsed the defendant's products," courts have found that the focus of the      right     of     publicity     claim     is     the     plaintiff's uncopyrightable *likeness* or *persona*. . . . . This is because the gravamen of that kind of right of publicity claim is the defendant's usurpation of the plaintiff's *identity* to sell a product or service with which the plaintiff has no relevant connection.
>
> . . .
>
> In our view, the pertinent distinction for such analysis is whether, on the one hand, the defendant's use of a work involving the plaintiff's likeness seeks advantage for the defendant on the basis of the plaintiff's identity — as where the plaintiff is identified in a manner that implies the plaintiff's endorsement, sponsorship, or approval (or in some cases the plaintiff's disapproval or rejection) of the defendant or its product, or holds opinions favored (or disfavored) by the defendant, or where (as with baseball cards, *see Cardtoons*, 95 F.3d at 962–64) the value of what the defendant distributes lies in its reference to the identity of the plaintiff shown — what might be called "identity emphasis," which argues against preemption — or whether, on the other hand, the advantage sought by the defendant flows from the reproduction or dissemination of the work itself (as opposed to the persona of the plaintiff), which argues in favor of preemption.

. . .

Accordingly, a crucial issue in determining whether Jackson's right of publicity claim is subject to preemption depends on whether Roberts's use of Jackson's stage name and the "In Da Club" sample could reasonably be construed by the intended audience as a false implication of Jackson's endorsement or sponsorship of Roberts or his product.

. . .

Although Roberts presented no evidence directly addressing how the relevant audience would understand and interpret the use of the Jackson sample and name, the combination of (a) the absence of any apparent message of endorsement, (b) the evidence that it is commonplace for hip-hop artists to so sample each other's songs without permission, and (c) the large number of artists other than Jackson who were similarly sampled and identified by Roberts compels the conclusion that there is no substantial likelihood that the audience could reasonably construe Roberts's use of the "In Da Club" sample, credited to Jackson, as a suggestion that Jackson had endorsed Roberts, his mixtape, or his upcoming commercial album. We conclude that the gravamen of Jackson's right of publicity claim, to the extent it is based on the use of the "In Da Club" sample, is not the use of his identity but rather the use of the copyrighted work itself, and that the focus of Jackson's claim therefore comes within the "subject matter of copyright."

*Id.* at 47–52.

96.   Likewise, in *Melendez* (a case relied upon by both Plaintiffs and the NCAA in their respective arguments), the plaintiff—a performer renowned for his characteristic performance on a radio show—sued a radio provider for violating his rights of publicity under both California common and statutory law after the radio provider aired excerpts from episodes of the radio show featuring the plaintiff's performances. *Melendez*, 50 F.4th at 297.

97.   In evaluating the plaintiff's claims under the Subject Matter Prong of the preemption analysis, the *Melendez* court opined, in relevant part:

37

As to the first requirement, we hold that Melendez's right of publicity claims come within the "subject matter of copyright." These recordings, in the language of the applicable statute, are "original works of authorship," 17 U.S.C. § 102(a), are "fixed in" a "tangible medium of expression," *id.* at § 101, and can be "perceived, reproduced, or otherwise communicated," *id.* Specifically, they fall within the category of "sound recordings" under the statute. *Id.* at § 102(a)(7). Moreover, as in *Jackson*, Melendez's right of publicity claims are based on Sirius XM's use of the copyrightable works themselves—*i.e.*, portions of archival HS Show recordings that Sirius XM uses in its online and on-air advertisements.

Melendez has not alleged that Sirius XM used his name or likeness in any way separate from, or beyond, airing excerpts of existing archival episodes in which he appeared. According to the amended complaint, the gravamen of Melendez's right of publicity claims is that Sirius XM used the challenged excerpts "to promote *The Howard Stern Show* . . . and Sirius XM in general, including, in particular, on channels that did not air the HS [Show] and thus are unrelated to Plaintiff's original appearances on the HS [Show]." Joint App'x at 8. Melendez directs his claims only at recordings of the HS Show—specifically, shortened versions of archival episodes in which he originally appeared. The amended complaint contains no allegations that his name or likeness was extracted in any way to appear independently from how it originally appeared in the archival episodes, or that the excerpts were manipulated in some manner to bring his identity into focus. Melendez's allegations, therefore, are directed at the copyrighted works in which he appears—the archival episode recordings—and not toward any separate use of his name or likeness. In other words, portions of the actual copyrightable works are what Sirius XM is allegedly reproducing and disseminating, not Melendez's name or likeness independent of the excerpts.

. . .

Therefore, Melendez's focus on the advertisements on the non-HS Show channels and for the platform more generally does not change the fact that his underlying challenge is to the unauthorized distribution and republication of copyrightable works, the excerpts of the archived episodes.

*Id.* at 303–05.

98.    Here, although Plaintiffs allege that the NCAA's website and YouTube channels contain commercial advertisements, (*see* FAC ¶¶ 102, 105), there are no allegations that game footage from the 1983 March Madness tournament is being used in any manner to suggest that Plaintiffs are promoting products that might be featured in those advertisements.   Indeed, Plaintiffs' counsel conceded this point during the following exchange at the hearing:

> THE COURT: And am I correct that you're not saying that these plaintiffs' likenesses are used in the advertisements that viewers have to watch to see the video; correct?
>
> [PLAINTIFFS' COUNSEL]: Correct.

(Hr'g Tr., at 11.)

99.    Accordingly, no viewer watching a rebroadcast of game footage from the 1983 March Madness tournament on the NCAA's website or its YouTube channels could reasonably believe that the players shown in that game footage are *personally* endorsing any particular brand of food, beverage, item of clothing, video game, or any other product being advertised in connection with a showing of the footage.

100.    Additionally, to the extent Plaintiffs are arguing that the NCAA's use of the game footage from the 1983 March Madness improperly suggests to the viewer that Plaintiffs endorse March Madness generally, the Second Circuit rejected a similar argument in *Melendez.*

> [T]here is no indication from Melendez's allegations in the amended complaint that Sirius XM has usurped his "*identity* to sell a product or service with which the plaintiff has no relevant connection." *Jackson*, 972 F.3d at 48.  Instead, to the extent that Melendez appears in Sirius XM's promotional material, his appearances are in connection to a product to which he has a very relevant connection: the HS Show in

39

which he appeared as a prominent cast member for over fifteen years. The challenged advertisements are for that same HS Show—not for a separate product or show on which Melendez has never performed or with which he otherwise has no connection.

Melendez attempts to rebut this point by arguing that Sirius XM airs the HS Show excerpts, in which he appears, in advertisements on its non-HS Show channels and in promotions for its entire platform. Even assuming that these allegations are true, which we must at the motion to dismiss stage, this distinction does not change our analysis of the subject matter prong. When the excerpts are used in the contexts Melendez challenges, they still remain inextricably connected to the HS Show because they are simply excerpts of longer archival episodes. In other words, any reference to Sirius XM in an advertisement about the archival episodes is identifying the technological medium that must be utilized to obtain access to the works at issue. *See Guglielmi v. Spelling Goldman Prods*, 25 Cal. 3d 860, 873, 160 Cal. Rptr. 352, 603 P.2d 454 (1979) (en banc) (Bird, C.J., concurring) ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise.").

*Melendez*, 50 F.4th at 304–05.

101.    Here, too, Plaintiffs do not contend that the game footage is being used in connection with a product with which they have no relevant connection. Rather, the game footage is being used in connection with March Madness, a subject to which Plaintiffs have a strong connection. Moreover, it bears repeating that—as in *Melendez*—Plaintiffs do not allege that the NCAA has somehow extracted their likenesses to appear independently from how they appeared in the original game footage. Similarly, Plaintiffs also do not contend that the NCAA has manipulated the game footage in a manner "to bring [Plaintiffs'] identit[ies] into focus." *Id.* at 304.

102.    As a result, the Court finds that Plaintiffs' allegations "are directed at the copyrighted works in which [they] appear[]—the archival [game footage]—and not toward any separate use of [their] name[s] or likeness[es]." *Id.*

40

103.   At the 1 May hearing, Plaintiffs' counsel suggested (for the first time) that the NCAA has used the 1983 game footage during each succeeding year to promote separately copyrighted events—that is, the copyrighted broadcast for that succeeding year's March Madness broadcast as distinguished from the 1983 March Madness broadcast.   However, this theory is absent from the FAC, which instead focuses on the NCAA's use of this footage to promote "March Madness" as a general brand.   The following examples are illustrative:

- The NCAA has used, and allowed its members, agents, affiliates, and co-conspirators to use, the images and videos of the members of Cardiac Pack to advertise its March Madness tournament, as well as for other commercial purposes, without the players' consent and while paying them nothing.

- Yet, the NCAA has never paid one cent to Plaintiffs for using their names, images, and likenesses or for their contribution to the evolution of March Madness as [a] revenue-generating juggernaut.

- The term caught on, and in October 2010, the NCAA paid Intersport, sports marketing agency whose CEO had trademarked the phrase, more than $17 million for the trademark. "March Madness" is now used by the NCAA to refer to and promote the tournament.

- The Championship Basketball Tournament, referred to exclusively as March Madness, now accounts for nearly all of NCAA revenues, through media rights and, to lesser degree, merchandise sales and views of archival games, documentaries, and other usages of current and past tournament footage.

- The NCAA also maintains at least two YouTube channels relevant to this action:   March Madness channel https://www.youtube.com/channel/UCKjEtnnXEHsXE9IvCb92V7g) and an NCAA sports channel https://www.youtube.com/user/ncaa). Via these channels, users can watch full games anywhere at any time. Viewers must watch advertisements in order to access games, generating additional income for NCAA.

> ▪ Even as March Madness has grown into a media juggernaut, yielding billions of dollars in revenue for the NCAA and its affiliates and co-conspirators, Plaintiffs have not received a single dollar in compensation for the ongoing use of their names and likenesses.

(FAC ¶¶ 5, 8, 93–94, 102, 112.)

104.    Thus, for all of these reasons, the Court finds that the Subject Matter Prong for preemption under the Copyright Act is satisfied.

**ii. Equivalence Prong**

105.    The Court likewise finds that Plaintiffs' claims satisfy the Equivalence Prong of the test for preemption.

106.    "[T]he focus of the 'equivalency' analysis is on whether the 'nature' of a state law action is qualitatively different from a copyright infringement claim." *Jackson*, 972 F.3d at 53 (cleaned up).

107.    In applying this test, the Court once again finds the Second Circuit's analysis in *Melendez* to be instructive.

> [T]o assess whether Melendez's right of publicity claims are qualitatively different for purposes of the [equivalence] analysis, we look holistically at what he "seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Briarpatch*, 373 F.3d at 306 (quoting *Altai*, 982 F.2d at 716). On this point, our prior analysis regarding the subject matter prong is instructive. As we previously explained, Melendez's right of publicity claims are simply attempts to prevent Sirius XM from rebroadcasting, in advertisements for the HS Show on Sirius XM and elsewhere, portions of archival episodes of the HS Show on which Melendez appeared. Ultimately, his right of publicity claims, under both common and statutory law, are aimed at stopping the reproduction of copyrightable works that embody his identity—the excerpts of the archival episodes of the HS Show—not the independent use of his identity to sell unrelated goods or services without his permission. In other words, Melendez's claims are "in no meaningful fashion distinguishable from infringement of a copyright." *Nat'l Basketball*

42

*Ass'n*, 105 F.3d at 851.  The works Melendez challenges are not only sufficiently equivalent to rights protected by federal copyright law, but are indeed protectable under federal copyright law.    Therefore, Melendez's right of publicity claims satisfy the [equivalence] requirement for preemption.  *See Laws*, 448 F.3d at 1144 ("The mere presence of an additional element ('commercial use') in section 3344 is not enough to qualitatively distinguish [a] right of publicity claim from a claim in copyright" because the "extra element must transform the nature of the action"; and "the underlying nature of Law's state law claims is part and parcel of a copyright claim" because the "claims are based on the premise that Sony reproduced a sample of [the song] for commercial purposes without her permission").

*Melendez*, 50 F.4th at 308.

108.    Here, as in *Melendez*, Plaintiffs' lawsuit ultimately seeks control over how the NCAA—in its capacity as the owner of the copyright to the 1983 March Madness broadcasts—uses the game footage obtained from those broadcasts.  In other words, Plaintiffs' lawsuit seeks compensation for—and to stop—what they perceive to be the unauthorized *reproduction* of copyrighted works, as opposed to "the independent use of [their] identit[ies] to sell unrelated goods or services without [their] permission."  *Id.*

109.    For this reason, the Court finds that Plaintiffs' claims are "in no meaningful fashion distinguishable from infringement of a copyright[,]" and thus, satisfy the Equivalence Prong of the preemption analysis.  *Nat'l Basketball Ass'n*, 105 F.3d at 851.

110.    Accordingly, because both prongs of the preemption test have been met, Plaintiffs' claims are preempted by the Copyright Act.

**CONCLUSION**

**THEREFORE**, it is **ORDERED** that the NCAA's Motion to Dismiss is **GRANTED**, and all claims asserted by Plaintiffs are **DISMISSED** with prejudice.

**SO ORDERED**, this the 6th day of August, 2025.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases

44