UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **DENARD ROBINSON, BRAYLON EDWARDS, MICHAEL MARTIN, and SHAWN CRABLE,** individually and on behalf of themselves and former University of Michigan football players similarly situated**,**<br><br>                              Plaintiffs,<br><br>     vs.<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION aka "NCAA", BIG TEN NETWORK aka "BTN", and THE BIG TEN CONFERENCE, INC.,**<br><br>                              Defendants. | **2:24-CV-12355-TGB-KGA**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 38, 40),**<br><br>**DENYING DEFENDANTS' MOTION TO CHANGE VENUE OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS (ECF NO. 39),**<br><br>**AND DENYING AS MOOT PLAINTIFFS' MOTION TO CERTIFY CLASS (ECF NO. 29)** |

Plaintiffs Denard Robinson, Braylon Edwards, Michael Martin, and Shawn Crable, all former University of Michigan football players, bring this putative class action for alleged antitrust violations and unjust enrichment claims against the National Collegiate Athletic Association ("NCAA") and one of its member athletic conferences, The Big Ten Conference, Inc., as well as against Big Ten Network ("BTN") (collectively, "Defendants"). Plaintiffs allege claims for monetary and injunctive relief arising from Defendants' use of the student-athletes'

names, images, and likenesses ("NILs") in any videos posted or licensed by Defendants, including through broadcasts, archival footage, and promotional campaigns.

Now before the Court are Plaintiffs' Motion for Class Certification (ECF No. 29), Defendants' NCAA, Big Ten Conference, and BTN's Joint Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 40), Defendant BTN's Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 38), and Defendants' Motion to Change Venue or, in the Alternative, to Stay Proceedings (ECF No. 39). Upon review of the parties' filings, the Court concludes oral argument will not aid in the resolution of these matters. Accordingly, the Court will resolve the present motions on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons stated below, Defendants' Motions to Dismiss (ECF Nos. 38, 40) will be **GRANTED**, Defendants' Motion to Change Venue (ECF No. 39) will be **DENIED**, and Plaintiffs' Motion for Class Certification (ECF No. 29) will be **DENIED AS MOOT.**

## I.    BACKGROUND

### A. Factual and Procedural History

Plaintiffs Denard Robinson, Braylon Edwards, Michael Martin, and Shawn Crable are former student-athletes who played for the University of Michigan's Division I men's football program between 2001 and 2012. Plaintiffs' First Amended Complaint ("FAC") ¶¶ 1–4, ECF No. 24.

Robinson played football at the University of Michigan from 2009 to 2012, Edwards from 2001 to 2004, Martin from 2008 to 2011, and Crable from 2003 to 2007. *Id.* Plaintiffs bring this purported class action against three Defendants: the National Collegiate Athletic Association ("NCAA"), one of the NCAA's member athletic conferences, The Big Ten Conference, Inc., and Big Ten Network ("BTN"). *Id.* ¶¶ 6–8. BTN is a joint venture between Fox Corporation and The Big Ten Conference that broadcasts sporting events and related programming featuring Big Ten institutions. *Id.* ¶ 8.

Plaintiffs allege that Defendants violated federal antitrust laws through NCAA rules restricting name, image, and likeness ("NIL") compensation to student-athletes, and by using their NILs for commercial purposes. *Id.* ¶ 39. Citing NCAA Bylaw 14.1.3.1, Plaintiffs allege that, for "decades," NCAA rules have required "student-athletes to sign forms that effectively transfer[red] their publicity rights to the NCAA" and the NCAA's member institutions "with the threat of ineligibility for competition if they refuse to sign." *Id.* ¶¶ 22, 43, 54, 58, 120. Plaintiffs "ground[]' their claims in the central allegation that the NCAA coerced student-athletes to sign a Student-Athlete Statement contract that purportedly "requir[ed] them to cede their rights to their [NIL]" and granted Defendants a "perpetual license" to "appropriate[e] those [publicity] rights without compensation" beyond the end of their collegiate careers. *Id.* ¶¶ 22, 24, 27, 37, 48, 54, 58, 80.

While Plaintiffs initially claim to sue *"on behalf of all former University of Michigan Football players who played prior to 2016"* in the opening of their FAC, *id.* PageID.218 (emphasis in original), the actual proposed definition for the class is much broader, seeking to include all NCAA student-athletes of any kind:

> All persons who were NCAA student-athletes prior to June 15, 2016,[1] whose image or likeness has been used in any video posted by or licensed by the NCAA, Big Ten Network, or their agents, distributors, contractors, licensees, subsidiaries, affiliates, partners, or anyone acting in concert with any of the foregoing entities or persons.

*Id.* ¶ 88. Plaintiffs claim that Defendants have engaged in an unreasonable restraint of trade, group boycott/refusal to deal, and conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Counts I, II, and III), and that Defendants have also been unjustly enriched by the uncompensated use of Plaintiffs' NILs (Count

---

[1]     June 15, 2016 is chosen because it is the start date of the settlement class period from a prior antitrust lawsuit against the NCAA that was settled in June 2025 (the "House settlement"). *See In re: College Athlete NIL Litig.*, No. 20-cv-03919, 2025 WL 1675820 (N.D. Cal. June 6, 2025) (*"House II"*), *appeal filed*, No. 25-4218 (9th Cir. July 9, 2025). In that case, the plaintiffs argued that the NCAA and its member schools unlawfully restricted student-athletes from profiting off their NILs. The *House* settlement provides, among other things, for billions in backpay paid into a settlement fund to former students for harms suffered between June 15, 2016 and September 15, 2024, allows for colleges to pay their student-athletes directly for their NIL through a revenue-sharing model, and allows student-athletes to continue to sign NIL deals with third parties, subject to NCAA and conference standards and limitations. *See id.*

IV). *Id.* ¶¶ 116–88. They are seeking declaratory and injunctive relief, as well as monetary damages. *Id.* ¶¶ 34–36, 296–97.

### B. Pending Motions

On September 10, 2024, Plaintiffs filed this purported class action lawsuit against the NCAA and BTN, claiming to sue on behalf of "[a]ll persons who were NCAA student-athletes prior to June 15, 2016, whose image or likeness has been used in any video posted by or licensed by the NCAA, [BTN], or [others]." Complaint ¶ 77, ECF No. 1. On December 3, 2024, Plaintiffs filed their First Amended Complaint with the same class definition and adding The Big Ten Conference, Inc. as a Defendant. ECF No. 24. And on December 13, 2024, Plaintiffs filed a Motion for Class Certification and Appointment of Class Counsel and Class Representatives, with the same class definition. ECF No. 29.

On January 13, 2025, Defendants filed three motions. Defendants NCAA, BTN, and The Big Ten Conference jointly filed a Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 40. Defendants argue that Plaintiffs' claims should be dismissed because (1) they are time-barred, (2) they are barred, in part, by prior releases or res judicata, (3) Plaintiffs fail to plausibly plead injury based on alleged use of their NILs in "broadcast sporting events," and (4) Plaintiffs cannot resuscitate their failed antitrust claims by recharacterizing them as unjust enrichment claims. *Id.* Defendant BTN also filed a separate Motion to Dismiss Plaintiffs' Amended Complaint

5

pursuant to Fed. R. Civ. P. 12(b)(6) that same day. ECF No. 38. BTN adopts the arguments in Defendants' joint Motion to Dismiss, and also argues that Plaintiffs' Amended Complaint should be dismissed because (1) it does not plausibly allege that BTN joined the allegedly unlawful conspiracy, (2) it does not plausibly allege that BTN's conduct was the cause of any antitrust injury because the injuries flow from pre-existing NCAA rules that BTN had no role in adopting or enforcing, and (3) the unjust enrichment claim fails as a matter of law because Plaintiffs do not allege they had any "direct" contact with BTN. *Id.*

Finally, Defendants jointly filed a Motion to Transfer Venue or, in the Alternative, to Stay Proceedings. ECF No. 39. Defendants seek to transfer this case to the United States District Court for the Southern District of New York pursuant to the "first-to-file" rule, arguing that Plaintiffs' claims overlap with the claims filed in an earlier class action, *Chalmers v. National Collegiate Athletic Association*, Case No. 1:24-cv-05008 (S.D.N.Y.).

Plaintiffs responded to and opposed all three of Defendants' motions, ECF Nos. 42, 43, 44, and Defendants filed reply briefs in support of their motions. ECF Nos. 45. 46. 47. The parties also filed supplemental briefs and notices of authority addressing recent decisions by courts in the Southern District of New York and the Southern District of Ohio, as well as responses and replies regarding those supplemental notices. ECF Nos. 48–50, 54–57.

## II.   LEGAL STANDARDS

### A. Transfer of Venue Under 28 U.S.C. § 1404(a)

Section 1404(a) to Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In resolving motions to transfer venue, courts consider factors such as the convenience of the parties and witnesses, accessibility of evidence, availability of process to make reluctant witnesses testify, costs of obtaining willing witnesses, practical problems of trying the case most expeditiously and inexpensively, and the interests of justice. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). "The movant carries the burden of showing that once all the relevant factors are scrutinized, fairness and practicality strongly favor the forum to which transfer is sought." *Rowe v. Chrysler Corp.*, 520 F. Supp. 15, 16 (E.D. Mich. 1981) (Harvey, J.). Absent such a showing, the plaintiff's choice of forum should rarely be disturbed. *See Reese*, 574 F.3d at 320. "A transfer is not appropriate if the result is simply to shift the inconvenience from one party to another." *Sullivan v. Tribley*, 602 F. Supp. 2d 795, 800 (E.D. Mich. 2009) (Lawson, J.).

### B. Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be

granted. To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) ("To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is the defendant who "has the burden of showing that the plaintiff has

8

failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829–30 (6th Cir. 2015); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6).").

## III.   DISCUSSION

### A. Defendants' Motion to Change Venue (ECF No. 39)

Defendants move to transfer venue in this case to the United States District Court for the Southern District of New York pursuant to the "first-to-file" rule and 28 U.S.C. § 1404(a). Under the "first-to-file" rule, "when duplicative lawsuits are pending in separate federal courts, the entire action should be decided by the court in which an action was first filed." *Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686, 688 (E.D. Tenn. 2005) (citation modified); *see also Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001) ("when actions involving nearly identical parties and issues have been

filed in two different district courts, 'the court in which the first suit was filed should generally proceed to judgment.'") (quoting *In re Burley*, 738 F.2d 981, 988 (9th Cir.1984)). This doctrine promotes judicial economy and "encourages comity among federal courts of equal rank." *Zide Sport Shop*, 16 F. App'x at 437.

Defendants argue that the instant action is a "copycat case" and that Plaintiffs' claims here overlap with the claims filed in an earlier, substantively identical class action, *Chalmers v. National Collegiate Athletic Association*, Case No. 1:24-cv-05008 (S.D.N.Y.). ECF No. 39, PageID.481–96. In the alternative, Defendants request that the Court stay this case until *Chalmers* is decided. *Id.* PageID.496–99.

*Chalmers* was a putative class action brought by 16 student-athletes who played college sports before June 15, 2016 on behalf of themselves and "[a]ll persons who were NCAA student-athletes prior to June 15, 2016, whose image or likeness has been used in any video posted by or licensed by the NCAA" and others. *Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 24 Civ 5008 (PAE), 2025 WL 1225168, at *6 (S.D.N.Y. Apr. 28, 2025), *appeal filed*, Case No. 25-1307 (2d Cir. May 21, 2015). The *Chalmers* plaintiffs asserted claims against the NCAA and six of its member conferences for violations of Sections 1 and 2 of the Sherman Antitrust Act and unjust enrichment in violation of state law based on allegations that the defendants forced student-athletes to enter into agreements upon enrolling in the universities that forced them to forego

10

compensation for use of their NIL and enabled the defendants to unjustly generate revenue without the plaintiffs' consent and compensation. *Id.* On April 28, 2025, the Honorable Paul A. Engelmayer dismissed the *Chalmers* class action with prejudice, finding that the plaintiffs' claims were untimely and otherwise precluded as a matter of law. *Id.*

As a consequence of Judge Engelmayer's ruling, there are no longer two duplicative lawsuits pending in two federal courts of equal rank. Assuming for the sake of argument that the *Chalmers* lawsuit in the Southern District of New York was duplicative of this action, "that action is no longer pending and a transfer would no longer promote judicial economy." *JCM Ins. Serv., Inc. v. Gov't Emps. Ins. Co.*, No. 1:23-CV-1801, 2024 WL 4268167, at *2 (N.D. Ohio Sept. 23, 2024); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, No. 2:24-cv-4019, 2025 WL 2022123, at *2 (S.D. Ohio July 18, 2025) (denying motion to change venue to Southern District of New York after the *Chalmers* case was dismissed). Nor would a stay.

Accordingly, the Defendants' Motion to Transfer Venue, ECF No. 39) is **DENIED**.

## B. Defendants' Motions to Dismiss (ECF Nos. 38, 40)

Plaintiffs bring claims against all Defendants for violations of Section 1 of the Sherman Act (Counts I, II, and III) and unjust enrichment (Count IV). The Defendants jointly move to dismiss Plaintiffs' claims under Rule 12(b)(6), arguing that Plaintiffs' claims are time-barred and barred by prior releases in other cases or res judicata,

that Plaintiffs fail to plead injury, and that they cannot restyle their "failed" antitrust claims into a state-law unjust enrichment claim. ECF No. 40; ECF No. 38, PageID.450, 454. BTN separately moves to dismiss on the additional grounds that Plaintiffs fail to plausibly allege BTN joined the allegedly unlawful conspiracy, that BTN's conduct was the cause of any antitrust injury, or that Plaintiffs provided a benefit directly to BTN to sustain an unjust enrichment claim. ECF No. 38.

## 1. Standing

Defendants argue that Plaintiffs fail to plausibly plead an injury in fact to sustain Article III standing and an antitrust injury. ECF No. 40, PageID.533. Defendants argue that Plaintiffs have no entitlement to broadcasting revenue by way of publicity rights in broadcasts, and thus have no injury, as the challenged rules do not deprive them of compensation that they would otherwise receive. *Id.* Plaintiffs contend that they have sufficiently asserted viable injuries to support their antitrust claims by alleging that, absent the challenged NCAA rules, bylaws, practices and agreements, they would be paid, at least in part, "hundreds of millions of dollars from broadcasting rights, advertising, and subscription fees" from showcasing past and present football games, highlight videos, and video clips featuring Plaintiffs. ECF No. 42, PageID.570.

"Standing, in a conventional Article III sense, requires proof of actual injury, causation, and redressability." *NicSand, Inc. v. 3M Co.*, 507

F.3d 442, 449 (6th Cir. 2007). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo Inc. v. Robins*, 578 U.S. 330, 339 (2016).[2] "To allege the invasion of a legally protected interest, a plaintiff

---

[2]      To the extent Defendants argue that Plaintiffs' lack Article III standing because they have not plausibly pled an antitrust injury, that claim is rejected. To establish an antitrust injury, a plaintiff must show injury "of the type that the antitrust statute was intended to forestall." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983). The injury to competition Plaintiffs allege here is the suppression of the price of the goods and services that student-athletes could have received in exchange for their labor and the right to use their NIL within the nationwide labor market. *See* FAC ¶¶ 39, 47, 109, 113, 114, 123, 125, ECF No. 24. It appears that Defendants are not arguing that Plaintiffs' alleged injury is not "of the type that the antitrust laws were intended to forestall," but instead that Plaintiffs have not been "injured in fact" because the compensation rules do not deprive them of any NIL compensation they would otherwise be entitled to receive. *See House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 816 (N.D. Cal. 2021) (defendants' argument that because class members "purportedly have no legal entitlement to broadcasting revenue by way of publicity rights in broadcasts, [they] have suffered no injury, as the challenged rules do not deprive them of compensation that they would otherwise receive … is not one about antitrust injury , but rather one about injury in fact.") (citing *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1067 (9th Cir. 2015)) (holding that "the NCAA has made a garden variety standing argument" by contending that "the plaintiffs have not been injured in fact by the compensation rules because those rules do not deprive them of any NIL compensation they would otherwise receive.")). In any event, assuming Plaintiffs pled an antitrust injury, their antitrust claims nevertheless will be dismissed for the reasons discussed below.

must show that the plaintiff has a right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint rests" and "just because a plaintiffs' claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 48–89 (6th Cir. 2021) (emphasis in original) (explaining that "[i]f that were the test, every losing claim would be dismissed for want of standing.") (citation omitted).

Here, Plaintiffs allege they were denied compensation from the commercialization of their NIL because of Defendants' conspiracy and anticompetitive actions. *See* FAC ¶¶ 18 ("Despite their critical roles in creating these commercially valuable moments, the athletes have been denied their rightful share of the profits. <u>This fundamental injustice … is a central issue that this First Amended Complaint seek to address and rectify</u>.") (emphasis in original), 37 ("The Plaintiffs' claims are based on the NCAA's long-standing practices and agreements that restrict student-athletes' ability to monetize their identities."), 60, 64, 73–75, ECF No. 24. Courts have found similar allegations sufficient to assert Article III standing. *See Pryor*, 2025 WL 2022123, at *4–5 (holding plaintiff's "alleged harm is the lost compensation that he would have received but for Defendants' unlawful conduct … [which] satisfies Article III's injury-in-fact requirement") (citing *NicSand*, 507 F.3d at 449

(holding lost profits resulting from alleged anti-competitive conduct "readily" satisfied Article III's injury requirement)).[3]

Whether Plaintiffs present valid antitrust claims is a merits question; "the standing question assumes [Plaintiffs'] theory to be correct and asks only whether [they] suffered an Article III injury" by being deprived of compensation for their NIL. *Ward v. NPAS, Inc.*, 63 F.4th 576, 582 (6th Cir. 2023). The Court concludes they have sufficiently alleged injury in fact. But because for the reasons stated below the Court finds that Plaintiffs' claims are barred by the applicable statutes of limitations and therefore must be dismissed, it will not address

---

[3]    Defendants' reliance on *Marshall v. ESPN Inc.*, 111 F. Supp. 3d 815 (M.D. Tenn. 2015), *aff'd*, 668 F. App'x 155 (6th Cir. 2016), is misplaced. In *Marshall*, which was not brought against the NCAA, the court dismissed student-athletes' claims predicated on their *right of publicity* under Tennessee statutory and common law on the ground that "Tennessee recognizes no right of publicity in sports broadcasts." *Id.* at 826–27. That court then found that the plaintiffs failed to allege an injury-in-fact as to their state law antitrust claims because they could not have been injured by a purported conspiracy to deny them the ability to sell non-existent rights under Tennessee law. *Id.* at 835. Here, Plaintiffs do not bring claims alleging Defendants violated their statutory or common law right to publicity in sports broadcasts under any state law but instead claim that Defendants' anti-competitive conduct required Plaintiffs to cede control of their NIL and thus violated the Sherman Act, similar to the claims advanced in *Pryor*, *Chalmers*, and *House*. Plaintiffs here further seek damages for lost endorsements, media appearances, and merchandise and licensing opportunities in addition to lost revenue tied to archived footage and sports broadcasts. *See* FAC, ECF No. 24, PageID.291–92.

Defendants' remaining arguments that some of Plaintiffs' claims are precluded by prior decisions under the doctrine of res judicata.

### 2. Plaintiffs' Sherman Act claims are time-barred

Defendants move for dismissal of Plaintiffs' Sherman Act claims in Counts I, II, and III as barred by the applicable statutes of limitations. ECF No. 39, PageID.525–29. Sherman Act antitrust claims are subject to a four-year statute of limitations beginning on the date that "the cause of action accrued." 15 U.S.C. § 15b. "A cause of action accrues and the limitations period commences each time a defendant commits an act which injures the plaintiff's business." *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848 (6th Cir 1990) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). Defendants assert that their challenged conduct or "act"—requiring Plaintiffs to "sign forms that effectively transfer[red] their publicity rights to the NCAA" "each academic year before their athletic season begins," *see* FAC ¶¶ 22, 58, ECF No. 24—occurred between 12 and 24 years ago, and possibly longer for other proposed class members. Defendants argue that Plaintiffs' antitrust claims therefore are barred by the applicable four-year statute of limitations. ECF No. 39, PageID.525–26.

In a seeming recognition of the limitations bar on their claims, Plaintiffs preemptively plead in their FAC that "Defendants are estopped from relying on any limitations" as a defense to Plaintiffs' claims and assert they are entitled to exceptions to the limitations period, relying on

the doctrines of equitable tolling and continuing violations. FAC ¶¶ 110–12, ECF No. 24. Plaintiffs similarly argue in their response to Defendants' joint motion to dismiss that their claims are timely, asserting: (1) the continuing violations doctrine renders their claims timely because Defendants' alleged unlawful conduct continues "from college to the present;" and (2) the doctrine of equitable tolling tolled the statutes of limitations and preserves Plaintiffs' claims. ECF No. 42, PageID.557–62. The Court will address each doctrine in turn.

### a. The continuing violations doctrine

Plaintiffs argue that their claims are not time-barred because they are saved by the continuing violations doctrine. Plaintiffs contend that although they "signed away their respective publicity rights *at the time they played sports for their respective schools*," FAC ¶ 112, ECF No. 24 (emphasis added), they continue to feel the adverse impact of Defendants' alleged "anti-competitive NCAA rules, bylaws, practices, and agreements whereby Defendants have … decreased the compensation (and taken it for themselves) for Plaintiffs' NIL from college to the present[.]" ECF No. 42, PageID.557.

As stated above, generally "the statute [of limitations for Sherman antitrust claims] begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 338. However, "[i]n the context of a continuing conspiracy to violate the antitrust laws," "each time a plaintiff is injured by an act of the defendants[,] a cause of action

accrues to him to recover the damages caused by that act and … the statute of limitations runs from the commission of the act." *Id.* (collecting cases). The Sixth Circuit has "refined the *Zenith* standard" as "two discrete rules":

> First, "[w]hen a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants." *Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74, 81 (6th Cir.1981). Second, "in the context of a continuing conspiracy, the statute of limitations runs from the commission of the act that causes the plaintiff's damage." *Chiropractic Coop. Ass'n of Michigan v. American Med. Ass'n,* 867 F.2d 270, 275 (6th Cir.1989).

*Peck*, 894 F.2d at 849. Thus, "even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Id.* (citing *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir. 1987)). An overt act is defined as (1) "'a new and independent act that is not merely a reaffirmation of a previous act,'" and (2) an act that "'inflict[s] a new and accumulating injury on the plaintiff.'" *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014) (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)). "[T]he Sixth Circuit has repeatedly rejected invocations of the continuing-violations defense that are mere reaffirmations of a previous act." *Id.* Further Sixth Circuit "decisions have repeatedly emphasized that profits, sales, and other benefits accrued as the result of an initial wrongful act are not treated as

18

'independent acts.'" *Id.* "For statute of limitations purposes, therefore, the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *Peck*, 894 F.2d at 849 (citing *Barnosky Oils,* 665 F.2d at 81 ("'[P]laintiffs may sue only for damages that result from acts committed by the defendants within four years preceding commencement of suit.'") (citation omitted)). When a plaintiff merely suffers the "ripples," or consequences, of a single previous violation, the clock keeps ticking down from the commission of the original act giving rise to those ripples. *Z Techs.*, 753 F.3d at 600.

Assuming—without deciding—that Defendants' requirement that Plaintiffs sign the Student-Athlete Statement each academic year before their athletic season begins, transferring their NIL right to Defendants, violates the Sherman Act, Defendants contend that Plaintiffs do not allege any independent "overt act" by Defendants within the limitations period. In their FAC, Plaintiffs allege that NCAA rules required them to sign forms, as a "non-negotiable condition of participation" in college sports "that effectively transfer[red] their publicity rights to the NCAA" and allowed Defendants to "exploit these rights indefinitely, without ever compensating the student-athletes whose talents and hard work generated substantial revenue." FAC ¶¶ 22, 27, 30, 50, 63, 69, ECF No. 24. Plaintiffs allege that "[u]nder NCAA Bylaw 14.1.3.1, student-athletes are required to sign a form titled 'Student-Athlete Statements' *each academic year before their athletic season begins*" which form "includes

clauses that effectively force young athletes to give up their publicity rights under duress, with the threat of ineligibility for competitions if they refuse to sign." *Id.* ¶¶ 58 (emphasis added), 106 ("conditioning student-athletes' eligibility to play on their surrender of their publicity rights for the duration of their college careers"). Plaintiffs allege that Defendants "have systematically and intentionally misappropriated the[ir] publicity rights … by using their names, images, and likenesses for commercial purposes without their consent or compensation" and that "[t]his misappropriation has resulted in significant revenue for the NCAA and its partners while depriving the student athletes of their rightful earnings." *Id.* ¶ 39.

Plaintiffs allege they were student-athletes at the University of Michigan from 2001 to 2012. Accordingly, the act that caused their injury—Defendants' requiring them to give up control over their publicity rights—occurred at the latest in 2012. Plaintiffs' FAC cites no specific overt act committed by Defendants after 2012. Defendants' alleged continued commercial use of Plaintiffs' NIL rights after 2012 is a "manifestation" or "reaffirmation" of Defendants' past conduct, not a new and independent act that restarts the statute of limitation. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (citing *DXS, Inc.*, 100 F.3d at 467–68). While Plaintiffs allege they continue to feel the adverse effects of Defendants' acts, "the fact that [Plaintiffs'] injuries have a rippling effect into the future only establishes that they might

20

have been entitled to future damages if they had brought suit within four years of the commission of the last antitrust violation." *See Peck*, 894 F.2d at 849.

Two federal district courts have recently addressed this same issue and both concluded that the continuing violations theory did not save the plaintiffs' claims and that they were barred by the statute of limitations. First, in *Chalmers*, the Southern District of New York district court (Engelmayer, J.) found:

> [T]he NCAA's use today of a NIL acquired decades ago as the fruit of an antitrust violation does not constitute a new overt act restarting the limitations clock. Instead, as the NCAA argues, the contemporary use of a NIL reflects performance of an aged agreement: a contract between the student-athlete and the NCAA under which it acquired footage and images of the plaintiff. Such a use is, in fact, a textbook example of the "performance of a contract" that is "a manifestation of the 'overt act,' [specifically] the decision to enter the contract, rather than an independent overt act of its own." The use by the NCAA or a conference defendant of a plaintiff's NIL acquired in the 1990s or early 2000s is a continuing *effect*—a consequence—an outgrowth of the alleged anticompetitive conduct. It is not a part of it.

*Chalmers*, 2025 WL 1225168, at *9 (internal citations omitted).

Similarly, a few months later, the Southern District of Ohio district court (Morrison, C.J.) found:

> Defendants' alleged act that caused his injury—requiring him to give them control over his publicity rights—occurred at the latest in 2010. And while Mr. Pryor alleges that he continues to feel the adverse impacts of Defendants' act, "the fact that

21

[his] injuries have a rippling effect into the future only establishes that [he] might have been entitled to future damages if [he] had brought suit within four years of the commission of the last antitrust violation." *Peck*, 894 F.2d at 849.

\*\*\*

[T]he continued commercial usage of Mr. Pryor's NIL rights is a "manifestation" of Defendants' past conduct, not a new and independent act that restarts the statute of limitations.

*Pryor*, 2025 WL 2022123, at \*7 (end citations omitted). The *Pryor* court went on to recognize that if the Court were to adopt the plaintiff's theory, "'the applicable limitations period for a § 1 claim would be infinite—an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct.'" *Id.* (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009)).[4]

The Court finds that the analyses and reasoning of the *Chalmers* and *Pryor* courts, while not controlling, are nevertheless compelling and applicable to Plaintiffs' claims here. The alleged "overt act" by the Defendants here was the requirement that Plaintiffs give Defendants

---

[4]     A North Carolina state court recently similarly found that plaintiffs' claims against the NCAA for use of their NIL in game footage from the 1983 basketball season were untimely and not saved by the continuing violations doctrine, stating that the plaintiffs' "relinquishment—through the signing of the SAS—was the discrete act forming the basis for any injuries they proceeded to suffer over the coming decades." *Members of N. Carolina State Univ.'s 1983 NCAA Men's Basketball Nat'l Championship Team v. NCAA*, No. 24CV017715-919, 2025 WL 2256311, at \*9–10 (N.C. Super. Ct. Aug. 6, 2025).

control over Plaintiffs' NIL and publicity rights, and this occurred at the latest in 2012. Any continued usages of Plaintiffs' NIL in footage or images of Plaintiffs' performances for commercial purposes would not constitute new overt acts restarting the limitations period but instead would rather be a recent "manifestation" of Defendants' original alleged anticompetitive conduct. *See Pryor*, 2025 WL 2022123, at *7; *Chalmers*, 2025 WL 1225168, at *9. Plaintiffs' FAC does not allege that any agreement between any Plaintiff and Defendants to surrender Plaintiffs' publicity rights occurred within, or close to, the four-year period before the filing of this lawsuit.

Accordingly, Defendants' alleged conduct that took place after the agreement, but in furtherance of the terms of the agreement, did not constitute a new overt act and the continuing violations doctrine does not apply to Plaintiffs' Sherman Act antitrust claims. Plaintiffs' Sherman Act claims (Counts I, II, III) therefore are time-barred and must be **DISMISSED**.

### b. Equitable tolling

Plaintiffs also rely on the doctrine of equitable tolling as a basis for their position that their claims are not barred by the limitations period. "The doctrine of equitable tolling allows courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010) (quoting

*Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 560–61 (6th Cir.2000)). "However, the doctrine of equitable tolling is used sparingly by federal courts" and a plaintiff "bears the burden of proving he is entitled to it." *Id.* at 784.

Plaintiffs plead in their FAC that they are entitled to equitable tolling of their claims "from the date of the *first unlawful act* of Defendants and their co-conspirators, including without limitation *the requirement that Plaintiffs and Class Members sign away publicity rights*, barely at the age of maturity, an extraordinary circumstance that prevented Plaintiffs from pursuing their rights, initially within the first act's limitations period, and the harm is ongoing and continuous to this day." FAC ¶ 111 (emphases added), ECF No. 24. In their response to Defendants' motion to dismiss, Plaintiffs argue that their limitations period should be equitably tolled because "Defendants maintained a culture of secrecy and misinformation regarding the commercial use of student-athletes' NIL" thus "obstructing Plaintiffs' ability to assert their legal rights." ECF No. 42, PageID.561. Plaintiffs thus maintain that equity should toll the limitations period due to Defendants' alleged acts of fraudulent concealment.

To toll a limitations period under the theory of "fraudulent concealment," a plaintiff must plead "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the

limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975)). "A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity." *Id.* And with regard to the "wrongful concealment" element, the plaintiff must point to "affirmative acts of concealment." *Id.* (quoting *Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007)). "Mere silence or unwillingness to divulge wrongful activities is not sufficient. Instead, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* at 446–47 (citation modified).

But the FAC does not specifically allege that Defendants engaged in fraudulent concealment or otherwise secreted or concealed Defendants' use of Plaintiffs' publicity rights or NIL. Plaintiffs instead repeatedly plead throughout their FAC that NCAA rules and bylaws required them to "sign forms that effectively transferred publicity rights to the NCAA … as a non-negotiable condition of participation" in college athletics and that this "has long been a standard practice." *See* FAC ¶¶ 22, 30, 39, 48, 58, 63, ECF No. 24. Plaintiffs therefore plead that Defendants' NIL rules were well-known to them. Plaintiffs do not say they did not know what they were relinquishing or that they were unaware of Defendants' practice of commercially using their NILs. Plaintiffs therefore fail to meet their burden to plead a claim of

fraudulent concealment "with particularity." *See Carrier Corp.*, 673 F.3d at 446–47 (allegations that lack any specificity, including "the time, place, and content of the alleged" fraudulent acts, "fall short of meeting the standard required to support a claim of fraudulent concealment").

Plaintiffs further plead that "[t]he NCAA's practices, including their profit motive, have been challenged legally and publicly. Numerous lawsuits and media reports have highlighted the exploitative nature of the NCAA's control over student-athletes' publicity rights[.]" FAC ¶¶ 32, 51, 126, ECF No. 24. Plaintiffs plead that in *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), the court found that the NCAA's compensation rules violated antitrust law by preventing student-athletes from receiving a share of the revenue generated from their own likenesses. *Id.* ¶¶ 31, 51, 126. And the FAC also points to *NCAA v. Alston*, 594 U.S. 69 (2021), noting that "the Supreme Court highlighted the NCAA's unlawful use of monopsony power to artificially suppress compensation for student-athletes." *Id.* ¶ 126. Plaintiffs' contention that "[c]hanges in the legal landscape demystifying [their] rights justify equitable tolling here," ECF No. 42, PageID.561, must be rejected. As evidenced by the prior litigation, other student-athletes certainly were aware of the same practices Plaintiffs complain of here as far back as 2009, and Plaintiffs do not claim to be unaware of the prior litigation. Accordingly, Plaintiffs knew of the material facts underlying their antitrust claims long before the four-year statute of limitations had run, precluding them from relying on equitable

tolling to save those claims now. Rather it appears that Plaintiffs' delay in bringing this lawsuit "is precisely the type of conduct that the statute of limitations is designed to prevent—parties sleeping on their rights." *Z Techs. Corp.*, 753 F.3d at 603.

Therefore, Plaintiffs' claims are time-barred and their Sherman Act Claims in Counts I, II, and III must be **DISMISSED WITH PREJUDICE**.[5]

### 3. Unjust enrichment

Defendants also move to dismiss Plaintiffs' unjust enrichment claim as time-barred. ECF No. 40, PageID.526, 540.[6] "Under Michigan law, unjust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another." *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 643 (E.D. Mich. 2017) (Steeh, J.) (internal

---

[5]   Dismissal of a time-barred complaint with prejudice is proper where the plaintiff never moved to amend the complaint and an amendment would be futile. *See Wershe v. City of Detroit, Mich.*, 112 F.4th 357, 372 (6th Cir. 2024); *see also Cardello-Smith v. Combs*, No. 24-cv-12647, 2025 WL 269167, at *4 (E.D. Mich. Jan. 22, 2025) (Levy, J.) ("Plaintiff's claim is barred by the applicable Michigan statute of limitations and must be dismissed with prejudice.") (citing *Majors v. Gerlach*, No. 16-13672, 2017 WL 3581321, at *4 (E.D. Mich. Aug. 18, 2017) (Goldsmith, J.) (dismissing with prejudice based on the applicable statute of limitations), *aff'd*, 821 F. App'x 533 (6th Cir. 2020)).

[6]   Plaintiffs' FAC does not identify any jurisdiction's law as the basis for their unjust enrichment claim. But both parties cite to Michigan law with respect to that claim in their respective briefs, and Plaintiffs affirmatively state in a supplemental brief that their unjust enrichment claim "is predicated on Michigan law," ECF No. 54, PageID.754. The Court will therefore apply Michigan law.

quotation marks and citation omitted). "A plaintiff alleging unjust enrichment must establish two elements: (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Id*

Under Michigan law, the statute of limitations on Plaintiffs' unjust enrichment claim would be at most six years. *See Bowman v. Dentsply Sirona, Inc.*, No. 1:22-cv-191, 2023 WL 2976179, at *3 (W.D. Mich. Mar. 23, 2023) (noting that while some courts apply the three-year statute of limitations to unjust enrichment claims under Michigan law, "the Michigan Court of Appeals has found that '[b]ecause claims of promissory estoppel and unjust enrichment are dependent on the existence of contract or contract principles,' they are subject to a six-year limitation period.") (citing *Dixon-Brown v. Covenant Cemetery Servs*,. No. 355476, 2022 WL 413904 at *2 (Mich. Ct. App., Feb. 10, 2022)), *report and recommendation adopted by* 2023 WL 2967834 (W.D. Mich. Apr. 17, 2023). An unjust enrichment claim generally "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827.

Like Plaintiffs' Sherman Act claims, their unjust enrichment claim is time-barred and not saved by the continuing violations doctrine or equitable tolling. Plaintiffs' unjust enrichment claim accrued at the time they plead that they conferred the benefit (control over their NIL) to Defendants, which at the latest happened in 2012. *See* FAC ¶¶ 180–83.

The continued ill effects Plaintiffs complain of merely resulted from that original violation. *See Ruffin-Steinback v. DePasse*, 267 F.3d 457, 462–63 (6th Cir. 2001) (affirming dismissal of unjust enrichment claims that were "duplicative or derivative to their right of publicity claims").

Moreover, as Defendants correctly state, the continuing violations doctrine is no longer recognized in Michigan and thus cannot extend Plaintiffs' unjust enrichment claim. ECF No. 40, PageID.527 n.5 (citing *Ganson v. Detroit Pub. Schs.*, No. 351276, 2021 WL 219225, at *3 (Mich. Ct. App. Jan 21, 2021)). Indeed, Michigan courts have recognized the "complete abrogation of the continuing wrongs doctrine in the jurisprudence of this state." *See Marilyn Froling Revocable Living Trust v. Bloomfield Hills Country Club*, 769 N.W.2d 234, 247 (Mich. App. 2009); *Township of Fraser v. Haney*, 983 N.W.2d 309, 313–14 (Mich. 2022) (recognizing the abrogation of the "continuing wrongs" or "continuing violations" doctrine in Michigan (which allowed a plaintiff to reach back to recover for wrongs that occurred outside the statutory period of limitations) and that "a plaintiff in Michigan may not revive stale claims even if the claims are part of a series of 'continuing violations.'"). Plaintiffs do not dispute this in their response. Accordingly, Plaintiffs' unjust enrichment claim is untimely and cannot be saved by the continuing wrongs doctrine. And even if the doctrine did apply, Plaintiffs' unjust enrichment claim would not be saved for the same reasons their Sherman Act claims are barred.

To the extent Plaintiffs assert that Defendants' alleged fraudulent concealment of the existence of their unjust enrichment claim equitably tolls the limitations period, that claim fails. "Under Michigan law, the statute of limitations will not be tolled absent some proof" of conduct constituting fraudulent concealment. *Davis v. Keyes*, 859 F. Supp. 290, 293 (E.D. Mich. 1994) (Feikens, J.) (citing *Lumber Village, Inc. v. Siegler*, 355 N.W.2d 654, 658 (1984)); MCL § 600.5855 (if fraudulent concealment is shown, plaintiff has two years from the time he knew or should have known of the claim to file suit). To establish fraudulent concealment, Plaintiffs must allege: "1) wrongful concealment by the defendants of their actions; 2) failure of the plaintiffs to discover the operative facts that are the basis of the cause of action within the statute of limitations; and 3) plaintiffs' exercise of due diligence until discovery of the facts." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 793 (E.D. Mich. 2015) (Borman, J.) (applying the doctrine of fraudulent concealment to an unjust enrichment claim); *State of Mich. ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 451 (W.D. Mich. 1995). "Ordinarily, silence alone does not constitute fraudulent concealment." *Davis*, 859 F. Supp. at 293 (citing *Lumber Village*, 355 N.W. 2d at 658). Rather, "the fraud must be manifested by an affirmative act or misrepresentation." *Lumber Village*, 355 N.W.2d at 658 (citing *Draws v. Levin*, 52 N.W.2d 180 (1952)).

Just as the limitations period for Plaintiffs' Sherman Act claims could not be equitably tolled because there was no showing of fraudulent concealment, so too is Plaintiffs' unjust enrichment claim barred. Plaintiffs plead they gave Defendants the benefit or control of their NIL at the latest in 2012, and Plaintiffs fail to plead that Defendants affirmatively concealed or misrepresented that conduct in some manner that prevented Plaintiffs from becoming aware of those actions, or that Defendants' alleged commercial use of that information years later is separately actionable.

Accordingly, Plaintiffs' unjust enrichment claim is **DISMISSED WITH PREJUDICE** as untimely.

### C. Motion for Class Certification (ECF No. 29)

Finally, because Defendants' motions to dismiss will be granted and Plaintiffs' First Amended Complaint will be dismissed with prejudice, Plaintiffs' Motion for Class Certification, ECF No. 29, will be **DENIED AS MOOT.**

## IV.   CONCLUSION

Accordingly, for the reasons stated above, Defendants' Motion to Transfer Venue, ECF No. 39, is **DENIED.**

Defendants' Motions to Dismiss, ECF Nos. 38, 40, are **GRANTED**.

Plaintiffs' Motion to Certify Class, ECF No. 29, is **DENIED AS MOOT.**

The First Amended Complaint is **DISMISSED WITH PREJUDICE**.

This Order closes the case.

**IT IS SO ORDERED.**

Dated: September 26, 2025 /s/Terrence G. Berg
          HON. TERRENCE G. BERG
          UNITED STATES DISTRICT JUDGE